# THE SILVIA.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 5.    Argued March 8, 1898 — Decided October 17, 1898.

A ship, whose port holes between decks are fitted with the usual glass covers and the usual iron shutters, and have no cargo stowed against them, is not unseaworthy by reason of beginning a voyage in fair weather with the glass covers tightly closed, and the iron shutters left open for the admission of light, but capable of being speedily got at and closed if occasion should require; and any subsequent neglect in not closing the iron covers is a "fault or error in navigation or in the management

of the vessel," within the meaning of section 3 of the act of Congress of February 13, 1893, c. 105, known as the Harter Act.

Section 3 of the Harter Act applies to foreign vessels.

THE case is stated in the opinion.

*Mr. Charles C. Burlingham* and *Mr. Harrington Putnam* for the Franklin Sugar Refining Company.

*Mr. J. Parker Kirlin* for the Silvia.

MR. JUSTICE GRAY delivered the opinion of the court.

This was a libel in admiralty, filed June 14, 1894, in the District Court of the United States for the Southern District of New York, by the Franklin Sugar Refining Company, a corporation organized under the laws of the State of Pennsylvania, against the steamship Silvia, of Liverpool, owned by the Red Cross Line of Steamers, to recover damages for injuries to a cargo of sugar, owned by the libellant, which had been shipped on or about February 15, 1894, upon the Silvia at Matanzas, Cuba, for Philadelphia, under a bill of lading, by which the sugar was " to be delivered in the like good order and condition at the port of Philadelphia (the dangers of the seas only excepted)," upon payment of agreed freight, " and all other conditions as per charter party dated New York 31st January, 1894."

The charter party, which had been made and concluded at New York January 31, 1894, provided that the Silvia, then at Tucacas, Venezuela, should proceed as soon as possible in ballast to Matanzas for a voyage thence to Philadelphia, New York or Boston; and contained these provisions: " The vessel shall be tight, staunch, strong and in every way fitted for such a voyage, and receive on board, during the aforesaid voyage, the merchandise hereinafter mentioned (the act of God, adverse winds, restraint of princes and rulers, the Queen's enemies, fire, pirates, accidents to machinery or boilers, collisions, errors of navigation and all other dangers and accidents of the seas, rivers and navigation, of whatever nature and kind soever during the said voyage al-

ways excepted). The said party of the second part doth engage to provide and furnish to the said vessel a full cargo, under deck, of sugar in bags. The bills of lading to be signed without prejudice to this charter."

The Silvia, with the sugar in her lower hold, sailed from Matanzas for Philadelphia on the morning of February 16, 1894. The compartment between decks next the forecastle had been fitted up to carry steerage passengers, but on this voyage contained only spare sails and ropes, and a small quantity of stores. This compartment had four round ports on each side, which were about eight or nine feet above the water line when the vessel was deep laden. Each port was eight inches in diameter, furnished with a cover of glass five eighths of an inch thick, set in a brass frame, as well as with an inner cover or dummy of iron. When the ship sailed, the weather was fair, and the glass covers were tightly closed, but the iron covers were left open in order to light the compartment should it become necessary to get anything from it, and the hatches were battened down, but could have been opened in two minutes by knocking out the wedges. In the afternoon of the day of sailing, the ship encountered rough weather, and the glass cover of one of the ports was broken — whether by the force of the seas or by floating timber or wreckage, was wholly a matter of conjecture — and the water came in through the port, and damaged the sugar.

The decree of the District Court dismissed the libel, and was affirmed by the Circuit Court of Appeals. 64 Fed. Rep. 607; 35 U. S. App. 395. The libellant applied for and obtained a writ of certiorari from this court.

It was adjudged by this court at the last term that the act of Congress of February 13, 1893, c. 105, known as the Harter Act, has not released the owner of a ship from the duty of making her seaworthy at the beginning of her voyage. *The Carib Prince,* 170 U. S. 655.

But the contention that the Silvia was unseaworthy when she sailed from Matanzas is unsupported by the facts. The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport.

The port holes of the compartment in question were furnished both with the usual glass covers and with the usual iron shutters or deadlights; and there is nothing in the case to justify an inference that there was any defect in the construction of either. When she began her voyage, the weather being fair, the glass covers only were shut, and the iron ones were left open for the purpose of lighting the compartment. Although the hatches were battened down, they could have been taken off in two minutes, and no cargo was stowed against the ports so as to prevent or embarrass access to them in case a change of weather should make it necessary or proper to close the iron shutters. Had the cargo been so stowed as to require much time and labor to shift or remove it in order to get at the ports, the fact that the iron shutters were left open at the beginning of the voyage might have rendered the ship unseaworthy. But as no cargo was so stowed, and the ports were in a place where these shutters would usually be left open for the admission of light, and could be speedily got at and closed if occasion should require, there is no ground for holding that the ship was unseaworthy at the time of sailing. *Steel* v. *State Line Steamship Co.*, 3 App. Cas. 72, 82, 90, 91; *Hedley* v. *Pinkney Steamship Co.*, (1892) 1 Q. B. 58, 65, and (1894) App. Cas. 222, 227, 228; *Gilroy* v. *Price*, (1893) App. Cas. 56, 64.

The third section of the Harter Act provides that "if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel." 27 Stat. 445.

This provision, in its terms and intent, includes foreign vessels carrying goods to or from a port of the United States. *The Scotland*, 105 U. S. 24, 30; *The Carib Prince*, above cited.

Not only had the owners of the Silvia exercised due diligence to make her seaworthy, but, as has been seen, she was actually seaworthy when she began her voyage.

This case does not require a comprehensive definition of the words "navigation" and "management" of a vessel, within the meaning of the act of Congress. They might not include stowage of cargo, not affecting the fitness of the ship to carry her cargo. But they do include, at the least, the control, during the voyage, of everything with which the vessel is equipped for the purpose of protecting her and her cargo against the inroad of the seas; and if there was any neglect in not closing the iron covers of the ports, it was a fault or error in the navigation or in the management of the ship. This view accords with the result of the English decisions upon the meaning of these words. *Good* v. *London Steamship Owners' Association*, L. R. 6 C. P. 563; *The Warkworth*, 9 Prob. Div. 20, 145; *Carmichael* v. *Liverpool Shipowners' Association*, 19 Q. B. D. 242; *Canada Shipping Co.* v. *British Shipowners' Association*, 23 Q. B. D. 342; *The Ferro*, (1893) Prob. 38; *The Glenochil*, (1896) Prob. 10.

In the case, cited by the appellant, of *Dobell* v. *Steamship Rossmore Co.*, (1895) 2 Q. B. 408, 414, the ship was unseaworthy at the time of sailing, by reason of the cargo having been so stowed against an open port that the port could not be closed without removing a considerable part of the cargo; and Lord Esher, M.R., upon that ground, distinguished that case from the decision of the Circuit Court of Appeals in the present case.

*Judgment affirmed.*