### THE SWIFTSURE.

(District Court, E. D. Virginia. February 19, 1923.)

**1. Seamen ⬅29(1)—No recovery for injuries beyond wages and cure unless vessel unseaworthy or proper appliances not supplied.**

There can be no recovery for personal injury to a seaman beyond recovery for maintenance, cure, and wages, unless the ship was unseaworthy or there was a failure to supply and keep in order proper appliances appurtenant to the ship, and this has not been changed by Seamen's Act March 4, 1915, § 20 (Comp. St. § 8337a), declaring seamen having command not fellow servants with those under their authority.

**2. Admiralty ⬅1—Congress has power to regulate maritime law.**

Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country.

**3. Admiralty ⬅1—General maritime law constitutes part of national maritime law unless changed by statute.**

In the absence of some controlling statute, the general maritime law as accepted by the federal courts constitutes part of the national law applicable to matters within the admiralty and maritime jurisdiction.

**4. Seamen ⬅29(2)—No recovery for death due to officers' failure to use ventilators to keep ship free from gas.**

Where an oil tank steamship was new and modern in design, with all necessary improvements to enable her to perform the service in which she was employed, and there was no failure to supply proper appliances nor to keep them in order, there could be no recovery for the death of a member of the crew, because of failure on the part of the ship's officers to use ventilators furnished for the purpose of keeping the "between-decks" free from gas issuing from the tanks.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

286 F.—44

In Admiralty. Libel by C. C. Thompson, administrator of C. W. Thompson, deceased, against the steamship Swiftsure. Libel dismissed.

J. Carlton Hudson and Ernest S. Merrill, both of Norfolk, Va., for libelant.

Hughes, Little & Seawell and Leon T. Seawell, all of Norfolk, Va., for respondent.

GRONER, District Judge. This is a libel in rem brought by the administrator of C. W. Thompson, deceased, to recover damages for the wrongful death of his decedent on the high seas and while a member of the crew of the steamship Swiftsure. The libel is filed under the Act of Congress approved March 30, 1920 (41 Stat. 537), giving the District Courts jurisdiction in such causes.

The Swiftsure is a large, modern oil tank steamship of 8,000 gross tons, 484 feet long, and 60 feet wide, and in November, 1921, was on a voyage from Port Labos, Mexico, to Fall River, Mass., loaded with crude oil. The oil tanks are located in the hold of the ship, and the tank tops extend up through the ship into the between-decks which, except for the tanks, is an unused space extending almost the entire length of the ship, with about 7 feet of clearance. After the tanks are filled and the bulkheads closed, there is, inevitably, an accumulation of gas, issuing from the tanks into the between-decks space, which makes it dangerous for any of the crew to go into this part of the vessel while on the voyage. To provide for the expulsion of the gas and the entry of fresh air, some 10 or 12 ventilators are furnished, spaced at regular intervals on the main deck with 26-inch openings, on which are placed cowls extending 5 or 6 feet above the deck and which may be turned alternately to the wind, thereby securing a sufficient current of air to keep the between-decks free of gas. At sea in very rough weather the cowl arrangement is removed to prevent shipping water, and a wooden block is inserted over the hole in the deck socket and a canvas cover applied, and when this is done, and the hatches closed, there is no opportunity for the circulation of air in the between-decks, except through the forward and aft companionways—unless they, likewise, are closed. Deceased was a member of the crew of the steamer, rated as assistant pumpman. This was his first voyage, and he had had no previous experience in the work in which he was then engaged.

On November 17, 1921, the steamer was only about two days out from Fall River, her point of destination, the weather was moderate, and there was no apparent reason why the ventilators and cowls should not have been open and in place; but instead of this all but two were closed, and the two in question were open only to the extent that the wooden plugs and canvas covers in the deck socket were off. The cowls to catch the air currents were not in use, and the only means of supplying fresh air was through the No. 2 hatch, an opening, 4 by 6 feet, used as a gangway to get from the main to the between-decks, and the two companionways. At about 8 o'clock in the morning, the mate instructed the chief pumpman to get a light, go down into the between-decks, lift up the hatch plates, and see how much oil had set-

tled down in No. 9 tank; it being the duty of the pumpman to inspect the tanks from time to time and report to the mate anything that was out of order or any repairs that were necessary. Around 9 o'clock of the same morning the mate, himself, went down into the between-decks, made a general inspection, lasting about five minutes, and, finding everything in order, returned to the main deck. About 10 o'clock the boatswain, who had gone down into the between-decks, found the pumpman and deceased, his assistant, lying abreast of No. 7 tank, the one dead and the other dying. Several members of the crew went immediately to their rescue and brought them to the upper deck, where unsuccessful efforts were made to resuscitate them. The men who brought out the bodies testified that there was no unusual smell of gas at the point where they were found, and, while there is no doubt that the men were asphyxiated, an explanation of the manner of asphyxiation is not furnished; but the theory is that, while at work or making an inspection, they ran into a pocket of gas which had accumulated on the side of the ship and were overcome.

If the ventilators and ventilator cowls, with which the ship was supplied, had been in place, it is fair to assume that the accident would not have occurred, and the question for decision is whether the negligence of the master of the vessel, in failing to use the equipment furnished for the protection of deceased, whose duty called him into that part of the vessel already fully described, and whose death ensued as the result of this negligence, will justify a recovery of damages, through his personal representative, in a proceeding in rem against the vessel.

On behalf of libelant, it is insisted that, notwithstanding the exercise of due care on the part of the vessel's owner in equipping her in a seaworthy condition, if she is afterwards allowed to become unseaworthy by the negligence of the owner's representative—the master—in failing to use all necessary appliances, a condition obtains in which the result is the same as though the owner had actually failed to furnish the appliances; and, likewise, he insists that the failure to install and keep in place the ventilators made the ship unseaworthy quoad the service which deceased was required to perform. There are few, if any, American cases in which the precise point here involved appears to have been decided, although there are many cases reported in which the negligence of the master or other officer of the vessel has been held not to entitle a recovery of indemnity for personal injury sustained by a member of the crew; but it would be a misuse of space to review them here, since this has already been done by the Supreme Court in The Osceola, 189 U. S. 158, 23 Sup. Ct. 483, 47 L. Ed. 760, which was a libel in rem for the recovery of damages for personal injury to a seaman through the negligence of the master. In the opinion in that case Mr. Justice Brown, after a full review, announced as settled the following propositions:

First, that the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued;

Second, that the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship;

Third, that all the members of the crew, except perhaps the master, are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure; and

Fourth, that the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew, but is entitled to maintenance and cure, whether the injuries were received by negligence or accident.

[1] A careful examination of the conclusions stated in the four preceding paragraphs clearly demonstrates, it seems to me, that as the law then was the only ground of recovery, beyond cure and wages, was confined to conditions arising, first, out of the unseaworthiness of the ship, or, secondly, the failure to supply and keep in order proper appliances appurtenant to the ship. It would seem to follow, therefore, that unless there has been some later change in the law thus announced, or unless libelant can bring his case within the exceptions just above referred to, he must lose.

[2, 3] That Congress has paramount power to fix and determine the maritime law which shall prevail throughout the country, and, further, that in the absence of some controlling statute the general maritime law as accepted by the federal courts constitutes part of our national law applicable to matters within the admiralty and maritime jurisdiction, has been decided, and is no longer open. Jensen Case, 244 U. S. 205–215, 37 Sup. Ct. 524, 61 L. Ed. 1086, L. R. A. 1918C, 451, Ann. Cas. 1917E, 900. But no act of Congress is cited which may be said to change the law as laid down by the Supreme Court in The Osceola. True, Congress, by section 20 c. 153, of the Seamen's Act, 38 Stat. 1164–1185 (Comp. St. § 8337a), has provided that—

"In any suit to recover damages for any injury sustained on board vessel or in its service seamen having command shall not be held to be fellow servants with those under their authority."

But the act has no particular relevancy in this case, since, as was said in the Chelentis Case, 247 U. S. 372, 38 Sup. Ct. 501, 62 L. Ed. 1171:

"The maritime law imposes upon a shipowner liability to a member of the crew injured at sea by reason of another member's negligence without regard to their relationship (i. e., liability for wages and cure); it was of no consequence therefore to petitioner whether or not the alleged negligent order came from a fellow servant; the statute is irrelevant. The language of the section discloses no intention to impose upon shipowners the same measure of liability for injuries suffered by the crew while at sea as the common law prescribes for employers in respect of their employees on shore."

So it would seem that in its final result the query here is: Was the vessel seaworthy, or was there a failure to supply and keep in order the proper appliances?

[4] That the vessel was seaworthy, in the ordinary acceptation of that term, there can be no doubt. She was new and modern in her design, with all the necessary improvements to enable her to perform the service in which she was employed. The Southwark, 191 U. S. 8, 24 Sup. Ct. 1, 48 L. Ed. 65; The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. As has been already shown, there was no failure to supply all proper appliances, nor was there any failure to keep the same in order. The sole ground of liability, if it be liability, is the failure on the part of the ship's officers to place in position and use the equipment furnished.

Under the English law, section 5, Act of 1876, it is provided:

"That the owner of the ship and the master, and every agent charged with the loading of the ship, or the preparing thereof for sea, or the sending thereof to sea, shall use all reasonable means to insure the seaworthiness of the ship for the voyage at the time when the voyage commences, and to keep her in a seaworthy condition for the voyage during the same."

The provisions of this act are as nearly identical as possible with the duty imposed under the American law as laid down by the Supreme Court in The Osceola, supra. Under both laws indemnity may be had against the vessel or her owner for unseaworthiness or failure to supply and keep in order proper appliances. The case of Hedley v. Pinkney Steamship Company, 7 Asp. M. L. C. 135, [1894] App. Cas. 222, was a case in which the highest court of England construed this provision of the English act. The libel there was brought by a seaman injured under the following circumstances:

The ship was equipped with bulwarks generally about 4 feet or 4 feet 6 inches in height; but abreast the hatchways, for the convenience of loading and unloading cargo, the permanent bulwarks were only 2 feet or 2 feet 6 inches high, and there were for the protection of the crew removable stanchions and rails, made to fit into the bulwarks and to raise them to the general height when the hatchways were not in use. When the ship left London, these stanchions and rails were on board but were not shipped. There was evidence that when the vessel left port it was usual and proper to ship the stanchions and rails, and that it was not safe for the crew that the ship should leave port without shipping them. During the voyage rough weather came on, and a seaman, while performing his duty on deck, was thrown against the starboard bulwarks, by a heavy lurch of the vessel, at the point where the stanchions and rails ought to have been, but were not, fell overboard and was drowned. If the stanchions and rails had been shipped the accident would not have happened.

In delivering the opinion Lord Herschell, L. C., after pointing out that the vessel was in all respects efficiently equipped, and that the fault was in not making use of the equipment which had been furnished, said:

"Under circumstances such as these, I do not think it can be said that there has been a failure to keep her in a seaworthy condition for the voyage, within the meaning of the enactment. Following, as it does, the obligation that the owner and the master, and every agent charged with the loading of the ship or the preparation thereof for sea, shall use all reasonable means to insure the seaworthiness of the ship for the voyage, I think the words 'to

keep her in a seaworthy condition for the voyage during the same,' point to an obligation of the same character, and not to a neglect properly to use the appliances on board a vessel well equipped and furnished."

The applicability of this language to the facts in the present case is apparent, and the conclusion there announced, if accepted, decisive, and that it should be accepted in the case under consideration I think is clear, in the light of The Osceola and cases there cited. A decree will therefore be entered dismissing the libel, with costs.