## THE POINT CHICO.

### No. 9658.

Circuit Court of Appeals, Fifth Circuit.

Aug. 20, 1941.

Carl G. Stearns, of Houston, Tex., for appellants.

Walter Carroll and Jos. M. Rault, both of New Orleans, La., for appellees.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

FOSTER, Circuit Judge.

This is a suit in admiralty by owners of 8,000 packages of sugar and 1,967 packages of canned salmon, shipped on the steamship Point Chico from Pacific ports to Gulf ports, to recover for damages caused by sea water. The suit was brought in rem against the ship and in personam against her owner, Swayne and Hoyt, Ltd. Respondent admitted damage to the cargo by sea water, entering the hold from the bilges, but pleaded exoneration under the provisions of the Harter Act, 46 U.S.C.A. § 190 et seq., incorporated in the bills of lading.

There is no dispute as to the law. Therefore, it would be useless to review the many decisions cited by the parties. The burden was on the ship owner to show the vessel was seaworthy at the beginning of the voyage. The Wildcroft (W. J. McCahan Sugar Refining Co. v. The Wildcroft), 201 U.S. 378, 26 S.Ct. 467, 50 L.Ed. 794. Whether a ship is seaworthy is a question which depends for its answer upon the facts peculiar to the case. The record is voluminous, consisting of some 700 printed pages and many exhibits brought up in the original. As all the findings of the District Court are vigorously challenged by libellants, we have been obliged to carefully examine the record. This requires us to review the facts somewhat fully.

The Point Chico is a steel steamship of the well deck type, 386 feet in length, 52 feet in beam and of a gross tonnage of 4,-

870. She was built in 1918 and was then classed by Lloyds and the American Bureau of Shipping as A-1 or equivalent rating, and has since maintained that rating.

The sugar was loaded at San Francisco and was stored in the after part of No. 1 hold, which has hatches on the forward well deck. The hold was prepared for the sugar by putting down dunnage boards close together. This flooring and the sides of the ship were covered with three layers of paper, two of them waterproofed on one side and the other, next to the sugar, not waterproofed at all. The paper was intended to prevent damage to the sugar by moisture that might be caused by the sweating of the hull and was required by shippers of sugar. The salmon was taken on at Seattle and was stored in the forward part of No. 1 hold.

At Seattle the ship took on a deck load of shingles in bundles. They were stowed on dunnage consisting of one inch boards laid across the ship about two feet apart and another layer of one inch boards close together on top of this, running fore and aft. The shingles were piled about 15 feet high and occupied practically the whole of the well deck. The bulwarks were of solid steel 55 inches high, with freeing ports and scuppers at intervals. There were tunnels through the deck load running to the bulwarks on each side, three feet wide and about four feet in height. Sounding pipes for the bilges were located in these tunnels. The carrying of the deck load was permissible under exceptions in the bills of lading and such loads are usually carried by ships in that trade.

On the afternoon of September 8, 1936, the ship encountered a heavy storm with the wind rising to a velocity of about 70 to 75 miles an hour. The superstructure of the ship was badly damaged and some of the deck load was washed overboard. Some of the bundles were broken and loose shingles remained on deck. The storm had sufficiently abated by 8 o'clock the next morning to permit an inspection of the ship. It was then found that the plug or cap closing the sounding pipe in the starboard tunnel was out and the sounding pipe had remained open during the storm. During the storm it would have been dangerous to life to have used the sounding pipes to test the bilges. There was evidence showing, under conditions prevailing, enough water to flood the bilges could enter them from this source in 2 to 3 hours. The last sounding through this pipe was about 4 o'clock on the afternoon of September 8th.

Respondent contends that leaving out the plug was due to the carelessness of a seaman taking the last sounding before the storm; that this was the sole cause of the damage; and that it was a fault or error in navigation or in the management of the vessel, for which the ship was exonerated under Section 3 of the Harter Act, 46 U. S.C.A. § 192.

Libellants contend: First, that the leaving out of the plug was not the result of carelessness but it had been displaced by a part of the deck load that had gotten loose during the storm, which resulted from improper stowage. Second, that in preparing the hold for the sugar, pieces of the paper used had gotten into the bilges through the negligence of the men doing the work, which prevented the proper operation of the bilge pumps. Third, that the starboard anchor chain pipe leading into the chain locker had not been properly closed and a great quantity of water, sufficient to overflow the bilges, had gotten in that way as the chain locker drained directly into the bilges.

The District Court found that the cargo had been damaged by sea water entering through the sounding pipe, which was caused by the carelessness of a member of the crew in leaving the plug out and not from any of the other causes urged by libellants. And this was a fault in the management or navigation of the ship, for which respondent was not liable under the provisions of the Harter Act.

The cap of the sounding pipe has been brought up in evidence. It is made of brass. The threaded part is two inches in diameter and the top about two and three-eighths inches in diameter. It has two holes in the top in which a key is fitted to tighten it up. It fitted into a brass flange of the deck, which was four inches in diameter and protruded $\frac{3}{8}$ of an inch above the deck. When the plug was screwed in tight it was flush with the top of the flange. The next morning it was found about 8 inches away from the pipe, wedged under the dunnage. The plug is sufficiently threaded and the threads are in good condition. The sounding pipe was two inches inside diameter, the flange was countersunk and the plug is machined to fit the countersinking. The flange was not forced

out of place or otherwise disturbed. While it was covered with loose shingles, it would be practically impossible for the shifting shingles to have exerted a twisting motion on the plug to unscrew it. The watches on the ship consisted of three seamen. One acted as a lookout, the second was at the wheel and the third did such duties as might be required around the deck. Respondent produced one of the crew on watch when the last sounding was made before the storm. He testified he did not make the sounding. It was stipulated that after reasonable efforts respondent had been unable to locate the other two men. Libellants argue respondent has offered no direct evidence as to how the plug was left out and has not sustained the burden of proving that defense. Respondent was not required to do the impossible. We think the circumstantial evidence was sufficient to prove the contention. The reasonable conclusion is that the plug was left out of the sounding pipe by the negligence of a member of the crew. In fact, every other reasonable hypothesis is excluded.

As to the stowage of the deck cargo, there is no doubt it was properly secured. It was stowed not closer than three inches from the bulwarks and probably a few inches further away because of flanges that ran along the top of the bulwarks. There was evidence showing the scuppers were not clogged nor were the freeing ports. There is evidence showing that because of the deck load there would be less water on the well deck when the vessel shipped a sea, and such water as fell was observed running through the tunnels. Conceding that the deck load interfered to some extent with the free flow of water through the scuppers and freeing ports, it is reasonably certain sea water could not have gotten into the hold for that reason alone. And it is not so contended.

The anchor windlass is located on the forecastle head, on a platform 14 inches above the deck. Each anchor chain pipe has a collar extending above the platform. These collars were horseshoe in shape and flush with the platform on the after end and about 3 inches higher on the forward end. When the ship was at sea they were sealed by putting laths or small sticks through the chain, pieces of canvas or other rags on top of the laths and then filled up with a half and half mixture of cement, about 2 to 3 inches thick. After the storm it was discovered the cement sealing of the starboard chain pipe had cracked and a wedged shaped piece about 4x5 inches was out. However, the rags and sticks were still in place. The sealing of the port pipe was intact.

There was evidence showing this was an ordinary construction and was the same as was on two sister ships and on a number of other ships, although on some vessels the collar on the chain pipe is round. There was also evidence showing that the method of sealing the chain pipes is the one usually employed on most ships and is considered safe and strong, although some ships use a metal or canvas cover for the same purpose, which is not considered as good.

The testimony of the master and chief officer is to the effect that with the rags and sticks still in place very little water would have gone through the chain pipes, the master estimating two or three bucketsful and the chief officer about a pint every time the vessel shipped a sea. The chain locker underneath is drained by a two-inch pipe into the bilges. This was criticized by the experts put on the stand by libellant on the ground that a better way would be to have the chain locker drained by a pump but was upheld as sound construction by the experts for the libellant. The chain locker was forward of the collision bulkhead. The underwriters' rules provide specifications for chain lockers. The chain locker on the Point Chico did not violate these requirements. The rules would serve to draw the attention of the underwriters' inspectors to the chain locker and the anchor chain pipes. It is evident from the frequent inspections of the ship, one by United States inspectors a few days before she left San Francisco, that the method of drainage and the construction of the chain pipes were approved. It is reasonable to presume that if any considerable amount of water had gone through the starboard chain pipe the sticks and rags would have been displaced. We conclude the amount of water entering the bilges was negligible and did not contribute to the damage of the cargo.

In the usual course the bilges were sounded and pumped three times a day. Until the storm no trouble with the pumps was discovered. During the storm the bilges were pumped every hour. Sometimes the pumps raced, indicating no water or that the strainers were clogged. The bilges drained into a strainer called a rose box in the bottom of the ship. There

was another strainer located in the fire room, which has holes ¼ to ⁵⁄₁₆ of an inch in diameter. Whenever the pumps raced, the fire room strainer was examined. Occasionally it was found to contain small pieces of paper, the same that had been used to protect the sugar. This paper, although strong, was not thick, in fact not thicker than ordinary wrapping paper. It was impossible to examine the rose box during the storm and larger pieces of paper could have gotten in there as the holes were larger. The pumps brought up not only water and these small pieces of paper but also a syrup caused by the sugar melting and a substance that one of the witnesses called gum, which contained oil and which was black in appearance. The hold had been inspected and the bilges looked into by the ship's officers before the sugar was loaded. Libellants criticize this inspection as not sufficient but it was done by experienced men and we think it was all that was reasonably required. It is hardly possible that there was any waste in the bilges from the paper used to line the hold. It was laid in straight strips and did not have to be fitted in the angles. There was no occasion for the workmen to do anything but cut the strips in the necessary lengths. If small pieces of paper had gotten into the bilges it is reasonable to suppose they would have clogged the strainers before the storm. It is reasonable to conclude that the paper around the sugar softened and became pulpy when the hold was overflowed and got into the bilges then.

While most of the evidence was taken by deposition the cross examination of the witnesses was extensive and skilfully conducted. It can not be arbitrarily disregarded. The Judge saw and heard all the experts in open court. Naturally their testimony was in conflict. The District Judge resolved this conflict and his conclusion has great weight. Furthermore, our examination of the record leads us to the same conclusion.

On the whole, we agree with the District Court. The burden of showing the vessel was seaworthy when she left her last loading port has been sustained. The damage to the cargo was caused by a fault or error in navigation or management of the ship for which the owner was not responsible under the provisions of the Harter Act. The Silvia, 171 U.S. 462, 19 S. Ct. 7, 43 L.Ed. 241.

The judgment is affirmed.