COMMERCE OIL CORPORATION

v.

THE Barge DXE-78 and Dixie Carriers, Inc.

No. 2137.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 17, 1957.

Henry J. Read, New Orleans, La., for libellant.

Lemle & Kelleher, George B. Matthews, New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

This action was brought by Commerce Oil Corporation (hereinafter called "Commerce") against the Barge DXE–78 and Dixie Carriers, Inc. (hereinafter called "Dixie") to recover damages for alleged cargo contamination. The matter was heard by the Court, and, after considering the evidence and the briefs of the parties, the Court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

#### I.

On May 22, 1951, Commerce and Dixie entered into a contract of carriage, pursuant to which Dixie agreed to furnish "one steel all-welded tank barge, capacity 12,500 barrels, and tug to handle" to move lubricating oil for account of Commerce from Good Hope, Louisiana. This contract contained the following provision:

> "Release: The cargo shall be transported at the sole risk of such cargo, in so far as loss or damage to such cargo is concerned, and neither Owner (Dixie), nor any person employed by Owner, nor any vessel, barge or other equipment used hereunder, shall be liable for any loss of or damage to such cargo regardless of the causes of such loss or damage, provided only that Owner shall have exercised due diligence to make such vessel and other equipment seaworthy and properly manned, equipped and supplied, and provided that reasonable care shall have been exercised in the receipt, stowage, handling, care and delivery of the cargo which shall be in the possession of the tow from the time that the petroleum products reach the barge pipe in loading until the products reach the shore line hose connection in unloading. Owner shall be entitled to the exoneration from liability under Section 3 of the Harter Act (46 U.S.C.A. § 192). Nothing in this contract shall be construed to deprive Owner of, or to limit Owner's rights to, any statutory protection or limitation of liability, which would otherwise be applicable."

#### II.

The Barge DXE–78 is an all steel, welded tank barge with rake tanks or cofferdams fore and aft. A longitudinal bulkhead and four athwartship bulkheads divide that portion of the barge between the rake tanks into ten cargo compartments, which are designated No.

1 port, No. 1, starboard, etc. Down the port side of the longitudinal bulkhead runs a cargo header or loading and discharging line approximately three (3') feet above the bottom of the barge. From this header, a line equipped with cut-off valves located on deck leads into each of the ten cargo compartments, so that each cargo compartment can be closed off.

### III.

Sometime prior to June 1, 1951, the DXE–78 was spotted at the General American Terminal at Good Hope, Louisiana, for loading with a straight cargo of lubricating oil. The barge was then inspected and approved for loading by an E. W. Saybolt & Company petroleum inspector acting for account of Commerce. A certificated tankerman furnished by Dixie also inspected the barge and reported that the cargo tanks were dry and in proper condition for loading. The Dixie tankerman then loaded the barge and upon completion closed all valves to the cargo tanks and left the terminal. The Saybolt inspector returned sometime later to gauge the barge and determine the amount of cargo that had been loaded.

### IV.

At 10:00 p. m. on June 1, 1951, the Tug Ben B, also operated by Dixie, arrived at Good Hope to pick up the DXE–78. Prior to taking the barge in tow, the hatches of the barge were checked and found to be closed. At the time the barge was taken in tow, the Master of the Tug, Bowman, was on watch. Shortly after leaving Good Hope, Bowman was relieved by the Mate, Sanson, at which time the tow was still downbound in the Mississippi River off Westwego. On being relieved, Bowman went to his room and went to sleep. While maneuvering to enter the Harvey Locks from the river, the Mate, Sanson, stranded the DXE–78 on concrete "rip-rap", putting a hole in the No. 1 port tank. Although Sanson knew of the stranding, he was not aware of this hull damage. Sanson did not report the stranding to Bowman un-

til after the tow had returned to New Orleans from Houston.

### V.

On the evening of June 2, Bowman noticed that the DXE–78, which was then the lead barge in the Ben B's tow, was about six (6") inches down by the bow. Either then or the following morning he ordered a check of the rake tanks of the barge and received a report that they were dry. At the same time or shortly thereafter, a check was made of the valves to the various cargo compartments and all of them, except those to the No. 5 compartments, port and starboard, were found to be open. Bowman ordered all valves closed to keep the barge from going farther down by the bow. On reaching Vermillion Locks, the tow had to await its turn to enter the locks and, while doing so, all valves to the cargo compartments of DXE–78 were opened. Bowman's purpose in doing this was to permit the cargo to equalize itself. The barge then came on an even keel, the valves were closed and the voyage proceeded without further incident to Houston. On arrival, the cargo was found to be contaminated with water.

### VI.

There is an apparent conflict in the evidence, since the Tankerman White testified that he had closed all valves on completion of loading, and, on the other hand, Bowman testified that when he first inspected the valves, all were open, except those to the No. 5 compartments. Explanation, however, lies in the fact that the Saybolt inspector returned to gauge the barge after the Dixie tankerman had left the terminal and, in all probability, he neglected to close the valves. Dixie, therefore, exercised due diligence to make the barge seaworthy. Additionally, since all of the cargo being carried in the barge was the same type of lubricating oil, there was no need for compartmental integrity in the barge, or for the valves to the individual compartments to be closed.

### VII.

The No. 1 port tank of the DXE–78 was holed by the collision with the rip-rap at the entrance to the Harvey Canal and the effect of equalizing the trim of the barge at Vermillion Locks was to permit water to enter all cargo compartment so that the entire cargo was contaminated.

### VIII.

■ The proximate cause of the cargo damage was the collision with the rip-rap and the subsequent opening of the valves. Both of these events occurred in connection with the navigation and management of the tow, not in connection with care and custody of cargo.

### Conclusions of Law

#### I.

The Court has jurisdiction of this action under 28 U.S.C. § 1333, and venue is properly laid in the Eastern District of Louisiana.

#### II.

Dixie exercised due diligence to make, and the Barge DXE–78 was in fact seaworthy and properly manned, equipped and supplied. The Silvia, 1898, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241. The British King, D.C.N.Y.1898, 89 F. 872, affirmed without opinion 2 Cir., 1899, 92 F. 1018; Jay Wai Nam v. Anglo-American Oil Co., 9 Cir., 1913, 202 F. 822.

#### III.

■ The contract here is one of transportation and the tug and barge, being under common ownership (or ownership *pro hac vice*), are to be considered as one vessel and entitled to invoke the provisions of Section 3 of the Harter Act. Sacramento Navigation Co. v. Salz, 1927, 273 U.S. 326, 47 S.Ct. 368, 71 L. Ed. 663.

#### IV.

■ The acts of the Master of the Ben B in manipulating the valves to the cargo compartments of the DXE–78 were done reasonably and in an attempt to correct the trim of the barge. They related to the management of the tow and any loss resulting therefrom is excused under the Harter Act and under the provisions of the Release Clause, above quoted. The Silvia, supra; The Mexican Prince, D.C.N.Y.1897, 82 F. 484; The Rudolph Albrecht, Arb.1930, 1931 A.M.C. 135; The Steel Navigator, 2 Cir., 1928, 23 F.2d 590, 1928 A.M.C. 388; Rooks v. Elliott & Watrous, Inc., D.C.R.I.1946, 65 F.Supp. 325, 1946 A.M. C. 1417.

A decree has been entered accordingly, dismissing this action at libellant's cost.