**COMPANIO PROSPERO S.A., Plaintiff,**

v.

**OLD DOMINION STEVEDORING CORPORATION, Defendant.**

**Civ. A. No. 6698–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.
March 26, 1969.

J. Davis Reed, III, Morton H. Clark, Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiff.

Roy L. Sykes, Jett, Sykes & Berkley, Norfolk, Va., for defendant.

## MEMORANDUM

MacKENZIE, District Judge.

This is an admiralty action filed by the COMPANIO PROSPERO S.A., a Panamanian corporation and the owner of the SS YIANNIS, against Old Dominion Stevedoring Corporation, a Virginia corporation.

On 29 August 1964, the YIANNIS arrived at Pier A, Sewell's Point, Norfolk, Virginia, to receive a load of scrap iron. The loading was commenced on the morning of 31 August 1964 and continued for several days. On Sunday, 6 September 1964, bilge soundings in the number 1 hold indicated flooding. Written notice of the condition was given by the captain of the vessel to the defendant on the morning of 8 September 1964. To find the cause of flooding, on 10 September 1964 discharge of the cargo just loaded in the number 1 hold began and upon its completion, on 17 September 1964, it was discovered that the sounding tube for the number 1 double bottom tank was severed at the tank top and that this was the cause of water entering the number 1 hold. Upon completion of repairs to the sounding tube reloading of the discharged cargo began and was completed on 21 September 1964. It is conceded by the plaintiff that the YIANNIS had a hole in her hull in the double bottom tank allowing sea water to enter that tank through the skin of the ship.

Plaintiff's suit for damages for costs of loading, discharging and reloading cargo and for demurrage, alleges that the fracture of the sounding tube was caused by the negligence of the stevedore in loading the vessel. It also alleges breach of contract and breach of the implied warranty of workmanlike service. The defendant denies liability.

Ordinarily the only use for the sounding tube here involved would be to serve as a pipe through which the sounding rod would pass to measure the depth of oil or ballast water in the number 1 double bottom tank. Under normal circumstances, such a tube would be reasonably sufficient for that intended purpose if the skin of the cylinder was of sufficient thickness to contain liquids within the tube itself or to prevent such liquids from entering anywhere except the open lower end thereof.

In this case, however, it is conceded by the plaintiff that the double bottom tank, into which the sounding tube was inserted, had a hole in it through which sea water was entering. As the vessel's draft increased with the burden of scrap iron and bunker oil, the puncture through the hull admitted sea water in increasing volume and pressure.

Under such circumstances, the duty of the vessel to maintain the sounding tube in a condition beyond that required for its normal use becomes apparent. The tube must be then kept in such state of repair as to withstand the new rigors which the vessel's condition of a holed hull then subjects it to. If rust is allowed to eat away its strength, it becomes a serious hazard as sea water entering through the hull into the double bottom tank will rise in the sounding tube under a considerable head of pressure, particularly as the vessel's draft deepens.

Here the tube is described as wasted from its normal thickness of $5/32$ inches to a thickness of $1/32$ inches (plaintiff's surveyor, Joy, R.T., p. 174); to $1/64$ inches (defendant's foreman, Holland, R.T., p. 219); to 100% wasted (defendant's surveyor, Sampsell, R.T., December 20, 1968, p. 14). No surveyor, for plaintiff or defendant, estimated that the tube was less than eighty per cent rusted out.

Such a wasted, rusted tube might have been sufficient for its intended use in most instances, but, here, we conclude it was not. In presenting the vessel to the stevedore for loading, with a hole through the hull into the double bottom tank and with a sounding tube leading therefrom severely deteriorated and insufficiently strong to withstand either (1) the rigors of the additional sea pressure exerted by the hull leak, or, (2) subject to fracture under apparently normal loading, we conclude that the vessel was unseaworthy upon presentation for loading.

While the hole through the skin of the ship into the double bottom tank might not, of itself, have rendered the vessel unseaworthy, yet, when such condition serves to impose additional strains and stresses upon other appurtenances of the vessel, additional duties devolve to the owners as to the maintenance or replacement of such other appurtenances.

With regard to the test of seaworthiness at the time of tender we find the following language in The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903):

"In the case of The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241, Mr. Justice Gray said: 'The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport'. This is the commonly accepted definition of seaworthiness. As seaworthiness depends not only upon the vessel being staunch and fit to meet the perils of the sea, but upon its character in reference to the particular cargo to be transported, it follows that a vessel must be able to transport the cargo which it is held out as fit to carry, or it is not seaworthy in that respect."

It is apparent, therefore, that the YIANNIS was not "tight, fit, staunch and strong and in every way fitted for the contemplated voyage," as is warranted by the vessel's owner. See The Plow City, 3 Cir., 122 F.2d 816 (3 Cir. 1941).

Whether the leak into the lower hold was caused by the natural deterioration of the sounding tube, or whether, in fact, it was caused by a fracture of the tube when subjected to the normal vicis-

situdes of the loading of bundled scrap, in either event, the unseaworthiness of the vessel was the cause of this accident and the plaintiff ought not to recover.

■ For the record, though perhaps not necessary for decision, the Court likewise concludes that negligence on the part of the defendant stevedore as having caused the fracture of the sounding tube has not been proved.

To absolve itself from blame as to protection afforded the sounding tube by the vessel the plaintiff has maintained that the proper pipe guard was in place —and apparently it was. The plaintiff does not argue that the sounding tube was actually struck by a bundle of scrap in the loading process. It agrees that there was no sign of a striking and no bending of the tube at the point of break. Plaintiff's theory is that bundles of scrap were allowed to so tumble into the lower hold on the top of the double bottom tank as to cause that tank top to flex or vibrate, and thus cause the rupture of the sounding tube at a point just above the tank top. Two things strike the Court about this argument. First, that the tube was not parted around its entire circumference. Instead, a portion of the skin of the tube had to be sawed to facilitate the placing of a plug therein. We do not think the verticle stress on the pipe caused by flexing of the tank top would exert itself on an apparently evenly wasted pipe so as to fracture one side of the pipe and not the other. Under the plaintiff's theory, it seems more reasonable to expect the entire pipe to have popped upon the sudden downward pressure. Secondly, plaintiff's theory is further clouded by the evidence that water did not enter the lower hold on the day of the loading of the area near the sounding tube on 4 September 1964, nor for two days thereafter. The fracture therefore apparently did not occur at the time of loading. When the break did occur and flooding was noted on 6 September 1964, 1323 tons of scrap iron were then in the hold on the tank top and could easily have been the cause of a sag of the tank top upon which it rested.

The loading of baled scrap iron is a rough proposition. The usual mode of loading used was used and was well known to the vessel owner. Tumbling bundles of scrap is the rule in loading of such cargo and is to be expected. No conduct in the loading of this vessel out of the ordinary has been shown here and we cannot conclude negligence has been proved.

■ Not necessary for decision, but, again, for the record, we pass upon the following proposition. Defendant urges that the provisions of paragraph 34 of the Charter absolves it from liability. Paragraph 34 provides " * * * all claims for damages allegedly caused by stevedores to be settled directly between owners and stevedores between loading and discharging ports. Master to notify stevedores of damages, if any, in writing within twenty-four hours after the occurrence; otherwise stevedores not to be held liable".

The log of the YIANNIS, on 6 September 1964, at 1800 hours, showed the starboard number 1 bilge to hold five feet of water and that the master *suspected* leakage on vessel due to damage by loading of cargo. Stevedore claims that the period for the twenty-four hour notice required in paragraph 34 of the Charter began then and points out to the Court that notice was not actually given to the stevedore until the morning of 8 September 1964, approximately thirty-six hours after the suspicion of leakage.

The log of the vessel and other evidence in the record reflect that bilge soundings of the starboard number 1 bilge were regularly taken at 1800 hours on the several days preceding 6 September 1964 with no discernible difficulties indicated by such soundings. Soundings at hours other than 1800 hours were apparently not taken. The bilge reading of five feet for the number 1 starboard bilge at 1800 hours, 6 September 1964, was the first cause for alarm. It was, according to the captain's log, "the first

**1086**

suspicion of leakage on the vessel due to damage by loading of cargo by the stevedores". But at that point, it could not be said that there was sufficient evidence to start the clock running against the twenty-four hour notice required under paragraph 34 of the Charter. The log reveals that after the initial alarm the ship's personnel began immediately to exercise the caution dictated by the excessive bilge water and despite the fact that 7 September 1964 was Labor Day and a holiday, regular bilge readings were instituted on a two hour basis in order to properly evaluate the problem. Pumping was begun and the rate of rise of the water was noted. Further tests at 0800 hours, on 8 September 1964, indicated that the water in the bilge was salt water.

It was on the basis of all of this information that the stevedore was notified on the morning of 8 September 1964 that damage, due to its loading of the vessel, was suspected. No representative of the stevedore was aboard the vessel or in the stevedore offices on Monday, 7 September 1964, Labor Day, a national holiday. Had anyone been aboard, the activity to determine the source of trouble would have been evident to them. Under the circumstances, this Court is of the opinion that it was only when the additional information made available by the cautious regular soundings and tests taken aboard the vessel on 7 and 8 September 1964 that an intelligent appraisal of the trouble and notice could be given to the stevedores on the morning of 8 September 1964. We hold the notice to have been given within the twenty-four hours of that time when the damage could be reasonably interpreted as due to possible damage in the loading of the cargo.

Admittedly, the decision of the Court holding that the plaintiff has not proved any negligence attributable to the defendant, and holding that the twenty-four hour notice provision of paragraph 34 of the Charter was timely met, are not necessary in view of the Court's holding that the ship, as tendered, was unseaworthy. We include them in this opinion for such appellate purposes as the parties hereto may pursue.

Counsel for defendant will prepare an Order in accord with this Memorandum dismissing the complaint.