579 F.2d 1204
 INTERNATIONAL BARGES, INC., a Delaware Corporation,
Plaintiff-Appellant,
v.
KERR-McGEE CORPORATION, a Delaware Corporation, and
Kerr-McGee Chemical Corporation, a Delaware
Corporation, Defendants-Appellees.
 No. 77-1256.
 United States Court of Appeals,
Tenth Circuit.
 Submitted on Briefs June 20, 1978.
Decided July 5, 1978.
 
 Robert B. Smith, of Bloodworth, Smith & Biscone, Oklahoma City, Okl., for plaintiff-appellant.
 Derrill Cody and Kerr, Davis, Irvine, Krasnow, Rhodes & Semtner, by Francis S. Irvine and Harvey L. Harmon, Jr., Oklahoma City, Okl., for defendants-appellees.
 Before McWILLIAMS, DOYLE and LOGAN, Circuit Judges.
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This is a diversity suit in which plaintiff, International Barges, Inc., sought damages arising from movement by it of 3600 tons of anhydrous ammonia in its barges from Lake Charles, Louisiana to New Orleans. The governing agreement was oral and provided that the demurrage rate was to be $125.00 per hour for a maximum of 48 hours delay and thereafter $170.00 per hour. Damages for delay in delivering the ammonia which plaintiff alleges was not through its fault are demanded in the amount of $32,278.60.
 
 
 2
 Defendant, Kerr-McGee Chemical Corporation, denied its responsibility for the demurrage and asserted that the delays were caused by the actions of plaintiff-appellant. Appellee Kerr-McGee interposed a counterclaim alleging a loss suffered by it as a result of the specific refusal of appellant to move its barge temporarily. This caused damage to American Cyanamid Company, which Kerr-McGee had to pay. This was $1,960. Kerr-McGee also sought $162,000 resulting from alleged loss in market of anhydrous ammonia. This was attributable to the action on the part of the appellant.
 
 
 3
 Trial was to the court, which awarded judgment to the appellant in the amount of $5,300 for demurrage sustained, and to appellee in the amount of $28,950 for loss suffered as a result of the cargo, anhydrous ammonia, in one of the barges being contaminated by remnants of butylene from the previous cargo. Appellant seeks reversal of this judgment on the counterclaim and seeks also an award of enhanced damages for the demurrage which the court failed to allow for the barge Mary Lee, which contained the allegedly contaminated anhydrous ammonia. It was the Mary Lee which was found to have 117 parts per million of butylene. This remained after a prior transportation, and even though the quantity of the butylene was somewhat infinitesimal, the trial court found that it was unacceptable and that it was International Barges' responsibility to deliver ammonia free of contamination. No such contamination was present in the cargo transported in the second barge of the appellant, the Marjorie B. The demurrage which was awarded to plaintiff in the amount of $5,300 was that which was incurred by the Marjorie B. The trial court found that the plaintiff was not legally responsible for the delay and resulting demurrage in connection with the unloading of the Marjorie B.
 
 
 4
 The crux of this controversy is whether the court was correct in placing legal responsibility on the appellant for the contamination of the anhydrous ammonia, remnants of which were in the Mary Lee's tanks when the ammonia was taken on. This was the basis for the judgment on the counterclaim in favor of Kerr-McGee for economic loss incurred by Kerr-McGee due to, so to speak, the impure state of the anhydrous ammonia which was sought to be delivered. It was also the basis for the judgment in favor of Kerr-McGee in the controversy involving demurrage resulting from the delay in unloading the Mary Lee. The underlying questions are, first, whether the contamination was so slight as not to be significant, and, second, whether the notification of Kerr-McGee by International Barges produced a waiver or shifted the responsibility to Kerr-McGee. The trial court resolved these questions in favor of Kerr-McGee.
 
 
 5
 The Mary Lee was found by the trial court to have been used for transportation or storage of butylene immediately prior to the transport of the ammonia. Plaintiff attempted to purge the Mary Lee of any residual butylene (using nitrogen for the purpose) prior to loading it with anhydrous ammonia. The court also found that the effort of appellant to decontaminate the barge was not wholly successful. The court also found that appellant notified appellee of the fact that the barge had been engaged in prior butylene service, which required that it be purged. Appellant emphasizes this fact, believing that it somehow or other shifted the burden of providing a clean vessel to the defendant or perhaps caused the defendant to assume the risk of the contamination. The trial court rejected both of these contentions, and we agree with the view thus adopted by the court.
 
 
 6
 The understanding was that the barges were to be delivered to the Monsanto Company dock at Luling, Louisiana. The barges arrived there at 8:00 a. m. on March 12, 1975, but unloading was not commenced because the ammonia had not reached the -28o F. temperature required for unloading. Afterwards the cargoes of both the Mary Lee and the Marjorie B were sampled and analyzed by Monsanto Company through a contract laboratory. This analysis revealed that the ammonia aboard the Mary Lee contained the 117 parts per million of butylene. On the other hand, the cargo of the Marjorie B was free of this condition.
 
 
 7
 A contract between Monsanto Company and Kerr-McGee allowed the latter to store anhydrous ammonia in the common storage tank of Monsanto. This agreement required that it had to contain 99.5% Minimum of anhydrous ammonia, a maximum of 0.5% Water and four parts per thousand maximum of oil.
 
 
 8
 Once it was discovered that the ammonia had a foreign substance Monsanto rejected it for storage in its common tanks. Kerr-McGee made an effort to dispose of the contaminated ammonia by contacting other companies in the area. It was unable to sell the contaminated material and it was unable to store it in a common storage tank. However, Kerr-McGee was able to make a trade with United States Steel Corp., whereby United States Steel agreed to accept the contaminated material in exchange for an equal quantity of anhydrous ammonia to be furnished by United States Steel to Kerr-McGee at some later time. The trial court was of the opinion that the delay in unloading the Mary Lee was attributable to the contamination of the cargo and that this was attributable, in turn, to the failure of the appellant to purge the barge prior to loading it with the ammonia. The delay in the unloading of the Marjorie B was ruled to be attributable to the testing carried out by Monsanto. The equipment was ready to be unloaded at 10:00 p. m. on March 17, but unloading did not commence then but was delayed until 1:10 a. m., March 18.
 
 
 9
 The court found that as a result of the testing proving to be negative as to the Marjorie B, the time taken for testing the Marjorie B did not toll the running of demurrage (in favor of appellant) on that barge. Therefore, the court awarded to appellant damage to cover demurrage on the Marjorie B from 5:00 p. m., March 15, 24 hours after her being ready for unloading, until 10:00 p. m., Monday, March 17, when Monsanto was ready for the unloading. This was a span of 53 hours at the rate of $100.00 per hour. Demurrage was disallowed for the additional delay from 10:00 p. m., March 17, until 1:10 a. m., March 18, because of this delay being due to the fault of the plaintiff.
 
 
 10
 We must determine whether the court was correct in finding that plaintiff in undertaking to load and transport the anhydrous ammonia in the Mary Lee which contained the contaminating butylene, failed to provide a vessel seaworthy and suitable; and in concluding that plaintiff received the ammonia in an uncontaminated state, caused it to become contaminated and, as a result, it was liable for the consequential damages which were suffered by Kerr-McGee. Our conclusion is that the judgments of the trial court were correct.
 
 I.
 
 11
 Kerr-McGee had paid $250.00 per net ton for the 1800 tons of ammonia which became contaminated aboard the Mary Lee. To replace it, the court found, Kerr-McGee had to purchase an additional 1800 tons of anhydrous ammonia at $265.00 per net ton. The trial court did not take into account the loss incurred by Kerr-McGee in obtaining the 1800 tons of ammonia from United States Steel Co. It noted that there had been a substantial drop in value from the time Kerr-McGee delivered the ammonia to United States Steel to the time that Kerr-McGee received the equal amount from United States Steel. The court regarded this, however, as an indirect loss which did not fully relate to appellant's deficiencies. It said that the fact that the market value had changed did not affect the damages in this case because the market was not a factor in the exchange between United States Steel and Kerr-McGee. Kerr-McGee was thus limited to damages in the amount of $15.00 per ton for the 1800 tons which it had purchased at the time in order to fulfill its obligation to the company for whom it had obtained the material, Brewster Phosphates.
 
 II.
 
 12
 The contentions of appellant are as follows:
 
 
 13
 1. That appellant was not compelled to provide shipping tanks which were 100 percent free of foreign substance, particularly in light of the fact that Kerr-McGee was given notice that the tanks had been used previously for storing the substance butylene.
 
 
 14
 2. That the trial court erred in determining that the ammonia in question was contaminated.
 
 
 15
 3. That there was error in determining the appropriate measure of damages.
 
 III.
 
 16
 In answer to International's position that there was no legal duty on its part to provide tanks which were 100 percent free of foreign substance considering the fact that Kerr-McGee was notified that the tanks had theretofore been used for storing butylene, Kerr-McGee simply calls attention to the fact that International received the material in an uncontaminated state and produced the contaminated condition. The trial court considered fault to have been proven once it appeared that the material was unacceptable and Monsanto refused to have it stored in its common tank.
 
 
 17
 The principle invoked is that a non-seaworthy barge had been provided contrary to the absolute duty owed to provide a vessel which was seaworthy. An early case, Newport News Shipbuilding and Dry Dock Company v. Watson, 19 F.2d 832, 833 (4th Cir. 1927), gives a broad definition of seaworthiness that was contained in Bouvier's Law Dictionary as "The sufficiency of the vessel in materials, construction, equipment, officers, men, and outfit, for the trade or service in which it is employed." In that case it was held that the lack of an outer guardrail did not render the launch there involved unseaworthy since it was plying the protected waters of the shipyard. The definition found in 2 Bouvier's Law Dictionary (Third Revision), p. 3027, discusses fully the seaworthiness concept complete with examples.[1]
 
 
 18
 The authorities cited in the briefs and those which are shown below support the conclusion that the warranty of seaworthiness is absolute and extends not only to patent defects but latent ones as well. Part of seaworthiness is its ability to carry the kind of cargo which it undertakes to carry. See The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898). No legal rationale is presented by International Barges which would justify making a distinction here in favor of the butylene that was present in the tank when the ammonia was taken on. Accordingly, we are unable to accept the argument of International Barges that the seaworthiness doctrine is not applicable to the material that was being transported here.
 
 
 19
 The barge was hired to transport ammonia, and the warranty was that it was capable of doing so without contaminating the material. In truth, it lacked this capability. Also, the evidence offered that Kerr-McGee had accepted the barge with the contaminant is insubstantial. There was no finding to this effect, and in any event it falls short of establishing that Kerr-McGee waived the implied warranty that the cargo would not be contaminated.
 
 IV.
 
 20
 Did the trial court err in determining that the anhydrous ammonia in question was in fact contaminated by material that was in the tank?
 
 
 21
 International does not dispute the fact that there was butylene present at the time that the ammonia was received to be transported. So it would seem that the argument is that the 117 parts per million is too infinitesimal to constitute contamination. The trial court found to the contrary based upon the evidence presented. It placed particular stress on the fact that the Monsanto Company Refused to accept the ammonia on the basis of the butylene count. The evidence supported the proposition that introduction of the contaminated ammonia would damage the total contents of the storage tanks. There is also testimony that it would be unacceptable to the Gulf Central Pipeline in which Monsanto shipped ammonia to various customers. Furthermore, Monsanto's contractual relations with Brewster Phosphates prohibited, according to the testimony, the material being in the ammonia. Thus the realities of the market attitudes had to be faced, and we believe that the court was not in error in so viewing the condition.
 
 
 22
 There was expert testimony from an analytical chemist which supported the court's determination that the material was in fact contaminated and that it would interfere with the manufacture of nitric acid. It was shown by the evidence also that no company contacted by Kerr-McGee was willing to buy the material or willing to receive it in common storage tanks.
 
 
 23
 On the basis of all of this evidence, the court made its finding. Based, then, on the presence of adequate evidence, we must hold that it is a finding which is not subject to being set aside.
 
 V.
 
 24
 The final question is whether the court correctly determined damages.
 
 
 25
 The trial court sought to determine the out-of-pocket loss considering the fact that Kerr-McGee was able to purchase a substitute quantity of ammonia for $15.00 more than the price which it paid. At the same time, it was able to trade off the contaminated material to United States Steel Corp. in return for a like amount of ammonia to be delivered in six months. The trial court thus determined that the only out-of-pocket loss that Kerr-McGee could demonstrate was the $15.00 per ton for the 1800 tons. The court rejected Kerr-McGee's argument at trial that the damages were subject to being fixed by reference to the $90.00 per ton market value loss which it suffered with respect to that which it obtained from United States Steel Corp. On this appeal, however, Kerr-McGee no longer urges this measure of damage.
 
 
 26
 We think that the court was correct in concluding that there was no market value at the port of destination for the damaged cargo and that there was immediate need for replacement of it. Thus the measure was not improper.
 
 
 27
 The only controversial issue in the damage area is the amount which was awarded to Kerr-McGee on its counterclaim arising from the contamination of the anhydrous ammonia. Appellant objects to the award which was made in favor of Kerr-McGee in the amount of $15.00 per ton for the 1800 tons which were carried in the Mary Lee and were found to be contaminated. It is argued that the question is not to be measured by the original cost as opposed to the replacement cost, but, rather, should be predicated on the value of the material at the point of destination. It is also argued that appellees were made whole by the trade of the ammonia in exchange for the future right to obtain an equal quantity of ammonia from United States Steel. It is difficult to see how appellee could benefit from resort to the United States Steel transaction because, in the final analysis, Kerr-McGee avers that it lost a far greater amount of money from this transaction. We think that the trial court was correct in selecting a much more moderate approach based upon the replacement cost at the scene of the problem.
 
 
 28
 Appellant makes another specious argument that Kerr-McGee offered to sell the ammonia to it for $275.00 per ton; that this offer to sell precluded from contending that its value was less than $275.00. The fact that this argument was made fails to prove that Kerr-McGee believed that it had a value of $275.00. It was more likely that they were seeking to obtain damages for the failure to deliver the ammonia in the same condition that it was in when it was shipped.
 
 
 29
 There would appear to be some range within which the court can select a measure of damages in this kind of case for the purpose of arriving at a result which conforms to the general rules of damages and which also responds to the particular facts of the case. It is furnishing compensation for loss which is the object. See Illinois Central Railroad v. Crail, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699 (1930). The court in the instant case would appear to have applied the rule which is generally applicable to cases in which the cargo is damaged rather than lost. The measure in such a case is the difference between market value at the port of destination and the market value of the goods in their damaged condition. See Santiago v. Sea-Land, 366 F.Supp. 1309 (D.C.Puerto Rico 1973). Apparently the trial court sought to apply the out-of-pocket loss rule described above, which is measured by the market value of the goods at the point of destination less the market value of the goods as damaged. This doctrine applied to the case at bar fairly compensates the prevailing party for out-of-pocket loss suffered and refrains from awarding damages which would result in a profit. It was not possible for the court to strictly apply the described doctrine since the damaged product had no market value at the point of destination. The court, therefore, did the next best thing by using the difference between the original cost of the product and the market value as measured by the replacement cost.
 
 
 30
 In sum, we conclude that the trial court was fair and equitable in its analysis and conclusion and that the judgment should be and it is hereby affirmed.
 
 
 
 [1]
 The sufficiency of the vessel in materials, construction, equipment, officers, men, and outfit, for the trade or service in which it is employed
 It is that quality which fits a ship for carrying safely the particular cargo which it takes on board for the voyage for which it is destined. The Thames, 61 Fed. (F.) 1014, 10 C.C.A. 232, 8 U.S.App. 580.
 Under a marine policy on ship, freight, or cargo, the fitness for the service of the vessel, if there is no provision to the contrary at the outset, is an implied condition, non-compliance with which defeats the insurance; 2 B. & Ald. 73; American Ins. Co. v. Ogden, 20 Wend. (N.Y.) 287; Myers v. Ins. Co., 26 Pa. 192; 4 H.L.C. 253; Augusta Ins. & B. Co. v. Abbott, 12 Md. 348.
 It is of no consequence whether the insured was aware of the condition of the ship, or not. His innocence or ignorance is no answer to the fact that the ship was not seaworthy. When the want of seaworthiness arises from justifiable ignorance of the cause of the defect, and is discovered and remedied before any injury occurs, it is not to be considered as a defect; Patrick v. Hallett, 1 Johns. (N.Y.) 241; McLanahan v. Ins. Co., 1 Pet. (U.S.) 183 (170), 7 L.Ed. 98; 2 B. & Ald. 73. See Richelieu Nav. Co. v. Ins. Co., 136 U.S. 408, 10 Sup.Ct. (S.Ct.) 934, 34 L.Ed. 398.
 The warranty of seaworthiness is absolute and extends to latent defects; 10 P.D. 103. Seaworthiness varies with the place of voyage, the class of ship, and the nature of the cargo; 2 F. & F. 263. She must be seaworthy in relation to the kind of cargo which she is to carry; The Silvia, 171 U.S. 462, 19 Sup.Ct. (S.Ct.) 7, 42 L.Ed. 241; L.R. 7 C.P. 421; if the voyage is to be by stages requiring different equipment, she must be ready for each stage at its commencement; (1899) P. 140 (C.A.).
 A vessel offering to carry frozen meat impliedly warrants that the refrigerating machinery was at the time of shipment fit to carry such cargo in safety; (1895) L.R. 2 Q.B. 550, where there was loss to a shipment caused by the negligence of the crew in the management of the refrigerating apparatus it was a fault "in the management of" the "vessel;" (1903) 1 K.B. 114; and that the seaworthiness of the vessel engaged in the dressed meat trade relates and extends to the refrigerating apparatus necessary for the preservation of the meat during transportation, is held in The Southwark, 191 U.S. 1, 24 Sup.Ct. (S.Ct.) 1, 48 L.Ed. 65.