Sam A. McDONALD, doing business as Sam McDonald Launch Service, as Owner of THE Tug CARRIE MACK,

v.

THE Barge 204 and Bay Towing & Dredging Company, Inc.

Doris Pauline PADGETT, Administratrix of the Estate and Chattels and Credits of John William Padgett, Deceased,

v.

Sam A. McDONALD, d/b/a Sam McDonald Launch Service, and Bay Towing & Dredging Company, Inc.

Petition of BAY TOWING AND DREDGING COMPANY, Inc., a corporation, for exoneration from, or limitation of liability as Owner of The Barge 204, Ex Damon Smith.

In re Sam A. McDONALD, doing business as Sam McDonald Launch Service, as Owner of The Tug Carrier Mack, in a cause of exoneration from or limitation of liability.

Nos. 2697, 2717, 2722, 2725.

United States District Court
S. D. Alabama, S. D.
July 3, 1961.

384

Pillans, Reams, Tappan, Wood & Roberts, Mobile, Ala., for Sam A. McDonald, d/b/a Sam McDonald Launch Service.

Hand, Arendall, Bedsole, Greaves & Johnston, McCorvey, Turner, Johnstone, Adams & May, Vickers, Riis & Murray, Mobile, Ala., for Bay Towing & Dredging Co.

Miller & Seeger, New York City, Moore, Simon & Layden, Mobile, Ala., for Doris Pauline Padgett, Adm'x, etc., and Cecil Davis, claimant.

Mize, Thompson & Mize, Gulfport, Miss., Johnston & Johnston, Mobile, Ala., for Thelma Kennedy Miller, Adm'x, etc., claimant.

DANIEL HOLCOMBE THOMAS, District Judge.

At approximately 2:30 p. m. on the afternoon of February 25, 1959, on the Mobile River in Mobile, Alabama, the unmanned Barge 204, owned by Bay Towing and Dredging Company, capsized on the Tug Carrie Mack, owned by Sam A. McDonald, d/b/a Sam McDonald Launch Service. As a result of the capsizing, the Carrie Mack sank to the bottom of the river and two members of her crew drowned.

Several lawsuits were filed as a result of the accident. McDonald filed a libel against Bay Towing, seeking recovery for damages to his tug, which was later raised from the river-bottom and has been placed back in operation. Mrs. Doris Pauline Padgett, administratrix for the estate of John William Padgett, engineer aboard the Carrie Mack, filed suit against Bay Towing for the death of her husband under the Alabama Wrongful Death Act and also against McDonald for damages under the Jones Act, 46 U.S. C.A. § 688. McDonald and Bay Towing both filed petitions seeking exoneration from or limitation of liability. In the latter two cases, in response to the monition which issued from this Court, claims

for damages have been filed by the administratrix of the Padgett estate and by Cecil Davis, deckhand aboard the Carrie Mack at the time of the casualty, and the sole survivor. The administratrix of the estate of Jesse E. Miller, captain of the Carrie Mack, in response to the monition in the Bay Towing petition, filed a claim seeking recovery for the alleged wrongful death of Captain Miller. Bay Towing, in response to the McDonald petition, filed a claim for damages to the barge and loss of cargo. Inasmuch as these causes arise out of a single accident, they were consolidated for trial and will be considered together herein.

Findings of Fact

On the morning of February 25, 1959, Captain McDonald entered into an oral agreement with Bay Towing to tow that company's Barge 204, which had been loaded by Bay Towing the previous evening with approximately 800 short tons of oyster shells, from its mooring place at McDuffie Island on the Mobile River to the plant of Ideal Cement Company, located approximately four miles upriver from McDuffie Island. The barge had been loaded in Mobile Bay, several miles from McDuffie Island, and had been towed by one of Bay Towing's tugs to the McDuffie Island location. Pursuant to the towage agreement, McDonald dispatched the Tug Carrie Mack, under the command of Captain Jesse E. Miller, to pick up the barge and tow it to the agreed destination.[1]

The Carrie Mack,[2] manned by Captain Miller, engineer John W. Padgett, and deckhand Cecil Davis, arrived at the location of the Barge 204 [3] sometime between 1:30 p. m. and 1:45 p. m. on the afternoon of February 25. They found the barge with one side against the riverbank and the other side facing the river.

The barge was listing to the side facing the river. Witnesses estimated this list to be from six inches, which they said would be hardly noticeable, to eighteen inches, which would place the listing side of the barge almost flush with the water line. There was testimony to the effect that the high side of the barge (the side near the riverbank) appeared to be aground. From this evidence it is reasonable to conclude, and the Court so finds, that the barge did have a noticeable list at the time the Carrie Mack arrived at the mooring position. The Court also finds that the list was noticeable to the extent that the crew of the Carrie Mack knew, or should have known, of its existence.

The crew did not inspect the tank compartments of the barge for water nor did they make any effort to determine what was causing the barge to list, although they could have done so with minimum effort. Captain Miller made the tug up to the barge on the river side (the low side) with the port side of the tug to the barge. Three lines were put out from the tug to the barge: a bow line which ran from the bow of the tug forward on the barge; a quarterline which ran from the tug's quarter bitts aft to the corner bitts of the barge; and a sternline leading from the tug's after towing bitts across the shore corner of the barge. Made up in this manner, the Carrie Mack, at approximately 2:00 p. m., commenced the towing maneuver upriver in the direction of Ideal Cement Company.

Numerous witnesses who had observed the Carrie Mack as she proceeded upriver with her tow were produced at the trial. All of them testified that the barge was listing. The majority of the witnesses testified as to the appearance of the tug and barge after they had moved some one and one-half to two miles upriver, or ap-

1. The towage agreement was made by phone, and contained nothing more than a promise to tow at a particular time and a promise to pay.

2. The Carrie Mack is a steel tug, 50 ft. in length with a 14 ft. beam, and is powered by a 210 h. p. diesel engine.

3. The Barge 204 is a steel, flat barge with registered dimensions of 180 ft. by 35 ft. by 9 ft. 10 inches. Its interior is divided into 6 center line tanks. Each of these tanks has a pump-out hole so that they may be pumped out separately. There was no pen or retaining wall on the flat deck of the barge.

proximately ten minutes prior to the accident. The events of this ten-minute period are of vast importance to the ultimate conclusion to be reached in these several causes.

During this period, the list of the barge began to increase at an alarming rate. The peak load of oyster shells began to shift in the direction of the tug and shells were being washed overboard on the listing side of the barge. On board the tug, Davis and Padgett hastened to the pilot house to get instructions as to what action they should take under the circumstances. They found Captain Miller talking on the radio-telephone to McDonald. He was advising McDonald of the situation and seeking instructions. McDonald testified that he had instructed Captain Miller to beach the barge.[4] Obviously, at this particular point there was no time left to carry out the instructions. Padgett gave Davis a butcher knife, the fire ax on the tug being broken, and told him to stand by the sternline, and when he, Padgett, cut the quarterline, Davis was to cut the sternline. When Davis saw that Padgett had cut the quarterline, he threw off the sternline. He saw Padgett disappear around the pilothouse, presumably to cut the bow line. At this point, the barge rolled over on its starboard side (the side nearest the tug), spilling the cargo of oyster shells onto the deck of the tug and into the river, and capsized on top of the tug. The impact sank the Carrie Mack to the bottom of the river. Davis was thrown clear of the vessels and was rescued by a skiff from a nearby tug. Captain Miller was seen floating in the river but he disappeared under the water before rescuers could reach him. Padgett's body was found in the living quarters of the tug. (This fact is difficult to reconcile with Davis's testimony.) The barge remained afloat in an up-side-down position and was later pushed to the riverbank.

The value of the tug immediately following the accident was $17,231. The value of the barge was $18,144.

McDonald and Captain Miller's estate contend that the accident was the result of the unseaworthy condition of the Barge 204. They argue that the barge was in a deplorable condition and that this condition was the sole and proximate cause of the casualty. Conversely, Bay Towing contends that the barge was seaworthy for the purpose for which it was being used. It further contends that the accident was the result of negligence on the part of Captain Miller in the operation of the tug and also the unseaworthy condition of the Carrie Mack. Padgett's estate and Davis, in their effort to attach liability to both Bay Towing and McDonald, join in Bay Towing's position to a degree, but maintain that Bay Towing should also be found liable because of the unseaworthy condition of the barge. In brief, McDonald and Miller's estate contend that the casualty resulted solely from the unseaworthy condition of the Barge 204; Bay Towing denies this allegation and argues that Captain Miller and McDonald were at fault; and Padgett's estate and Davis contend it was the combined unseaworthiness of the tug and barge and the negligence of Captain Miller which caused the casualty.

The Court will now examine each of the above allegations.

## Barge 204

The Barge 204 was originally constructed as an oil barge and was approximately seventeen years old. In 1952, it was converted from an oil barge to a shell barge, and had been used in that capacity since that time. Since its conversion, the barge had been drydocked on two separate occasions, the last being in February 1958 when some repairs were made to the deck and the bulkhead, and some internal work was done. On the occasion of the 1958 drydocking, it was observed by employees of Bay Towing that the bottom plates of the barge were badly wasted, but no repairs were made at that time to the wasted area.

---

4. There were several locations along the riverbank where the barge possibly could have been beached.

Bay Towing's employees and one or more of its managing officers observed the barge while she was tied up at McDuffie Island. They testified that the barge was listing when they observed her but that they took no steps to make a close inspection and determine the cause. They further testified that the barge had been pumped out some four or five days prior to the casualty.

After the accident, the bottom of the barge was examined and numerous cracks and breaks were discovered. These were old breaks and were not the result of the accident. They measured up to six inches in length and were from $\frac{1}{8}$ to $\frac{3}{8}$ inch in width. An expert witness calculated that the barge was taking on water through these breaks at the rate of approximately fifteen tons per hour. That the barge was taking on water at a rapid rate was further evidenced by the fact that the list grew progressively worse as the tug and tow proceeded upriver. Subsequent to the accident in question, the bottom plates of the barge were repaired. From the evidence, the only entrance for water into the barge was through the aforementioned cracks and breaks. Although there was evidence to the effect that most of the shell barges operating in the Mobile River area have some degree of list, I think the conclusion inescapable that the Barge 204 was unseaworthy.

In the United States Supreme Court decision of The Silvia, 1898, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241, the Court, speaking through Justice Gray, states:

"The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." 171 U.S. at page 464, 19 S.Ct. at page 8.

I do not think the Barge 204 met this test. The evidence, in my opinion, is conclusive that the barge was not reasonably fit to transport the load of oyster shells because of the condition of its bottom plates. I further find that Bay Towing, through its employees and managing officers, had knowledge, or certainly should have had knowledge, of this condition.

## The Carrie Mack

Bay Towing, Padgett's estate, and Davis set forth several factors which they contend made the Carrie Mack unseaworthy. The only allegations which warrant consideration are (1) the failure of the Carrie Mack to have a sound fire axe aboard, and (2) the improper ballasting of the vessel.

It is undisputed that the handle of the fire axe on the vessel was broken. It is also a well known fact that fire axes aboard vessels are used as safety devices in emergency situations, e. g., cutting tow lines; however, under the circumstances, I do not believe any number of perfectly sound fire axes would have benefited the Carrie Mack's crew. By the time Davis and Padgett started to cut the towing lines with butcher knives, it was too late for the tug to maneuver so as to clear the barge. At that moment, a usable fire axe would not have assisted the tug in avoiding the accident. The failure of the vessel to have a usable fire axe on board may, under some circumstances, constitute an unseaworthy condition; but I find as a matter of fact that in this instance the absence of a usable fire axe was not the proximate cause of the accident and in no manner contributed to the resulting casualties.

It is also contended that improper ballasting of the tug caused her to sink. Much significance is attached to the fact that McDonald himself, who admittedly was not a nautical engineer, had ballasted the tug through the use of pieces of iron, concrete blocks, and other materials. These materials were not cemented in the tug, but were wedged in together. Bay Towing and the others argue that if the tug had been properly ballasted, she would not have sunk under the impact of the barge. I do not think the method by which McDonald ballasted the tug indicates that she was improperly ballasted. It is mere conjecture to state that proper ballasting would have prevented the tug's sinking. Consequently, the Court finds as a matter of fact that the tug Carrie Mack was seaworthy.

388

### Negligence of the Master of the Tug

Bay Towing, joined by Padgett's estate and Davis, set forth numerous acts or instances where Captain Miller, as master of the tug, failed to act, which acts or omissions they contend constituted negligence and were the proximate cause of the accident. In substance, these acts are: (1) Miller's taking the obviously listing barge in tow without endeavoring to ascertain the cause of the list and without pumping out the barge's tank compartments; (2) the manner in which he made up to the barge; (3) his failure to keep or cause to be kept a close watch over the barge while she was underway, although he knew or should have known of the listing condition; and (4) his failure to cut away from or beach the barge when it was obvious that the list was growing progressively worse and increasing to a point of danger.

Several experienced tug captains testified as to how they would have made up to the barge if they had found her in the same position as Miller. Some of them agreed with Miller's method and others disagreed. I am of the opinion that it was not negligence for Miller to make the tug up to the barge in the manner he did. There is nothing in the evidence to indicate that the casualty could have been avoided by making the tug up to the barge in any other way.

I further find that Miller's action in taking the barge in tow initially, without first seeking to ascertain the cause of the list, did not constitute negligence. From the evidence, it is apparently common knowledge among the men who work the river that many of the shell barges operating in the Mobile area have some degree of list. Bay Towing's own employees testified that they did not notice anything wrong with the barge as she lay in her mooring slip on McDuffie Island prior to the time she was taken in tow by the Carrie Mack. They also stated that they had pumped the barge out a few days prior to the date in question. The Court finds as a matter of fact that the appearance of the barge at the time Miller took her in tow was not such as to give him cause for alarm; hence, his action in taking her in tow was not negligent.

There is merit in the contentions that Miller was negligent in his actions after the tug and tow began the maneuver up-river. The evidence, as depicted by the testimony of the witnesses, presents a very clear picture of the events that occurred as the tug and tow proceeded up-river. The barge had been listing from the time the tug took her in tow. While this may not have caused Miller to become alarmed, it should have put him on notice to keep the barge under constant surveillance. The list increased to a point where the barge edge was flush with the water level and shells were being washed overboard. This condition existed from ten to fifteen minutes prior to the accident. It is difficult to imagine that Miller was not fully aware of this condition; and if he was not, as master of the tug, he should have been aware of it.

Captain Miller, immediately prior to the capsizing, contacted his superior on the radio-telephone to inform him that the barge was sinking and to request instructions. By this time, it was too late for any action to be taken. It is impossible to determine how long Miller was aware of the existing danger; but as an experienced tugboat captain, he should have been aware of it from the moment of its inception. With the possibility of disaster so evident, one ponders why Miller, who as master of the tug had full authority to take whatever action he deemed advisable in his sound judgment, consumed precious time in calling his superior for instructions. It is also difficult to determine why he delayed so long in contacting McDonald. The only reasonable explanation is either that he thought he could get the barge to her destination or he was not keeping the tow under observation. The evidence shows that there were numerous locations where he could have beached the barge prior to the time he called McDonald.

Unquestionably, Captain Miller erred in his judgment to keep on his

course upriver. However, every error in judgment is not negligence. As the court stated in The Eli B. Conine, 2 Cir., 1916, 233 F. 987:

> "The error must be measured by the standards of conduct and business knowledge furnished by the evidence and by experience of which even courts can take cognizance without direct testimony. If the error, viewed from that standpoint, is such as would not have been committed by a reasonable man, reasonably skilled in his occupation, it is negligence." 233 F. at page 988.[5]

With this test in mind, I find that Captain Miller's error in judgment was negligence. There was ample opportunity for him to either beach the barge or cut away from her prior to her capsizing. Admittedly, he could not foresee the exact moment the barge would sink or capsize. But he must have been cognizant of the perilous condition of the barge prior to the time he contacted McDonald; and if he was not, as master of the tug, it was his duty to keep himself apprized of the situation at all times. His failure in that duty must be found to be negligence. His desire to reach his destination, while admirable, was no excuse for keeping the barge in tow until his own life and the lives of his crew had become endangered.

In summary, the Court finds that the unseaworthiness of the barge and the negligence of the master of the tug both contributed to the accident and produced the resulting casualties.

### Conclusions of Law

#### I.

This accident having occurred on navigable waters, the Court has jurisdiction of the subject matter now before it.

#### II.

Having found as a matter of fact that the Barge 204 was unseaworthy and that Bay Towing, through its officers and employees had knowledge, or at least had the means of knowledge, of this unseaworthy condition, it follows as a matter of law that Bay Towing is not entitled to be exonerated from, nor to limit its liability. Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363; Spencer Kellogg & Sons, Inc. v. Hicks, 1932, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903; States Steamship Co. v. United States, 9 Cir., 1958, 259 F.2d 458; Saskatchewan Government Ins. Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385. Section 183(a), Title 46 U.S.C.A., provides as follows:

> "(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not * * * exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

Employees of Bay Towing testified that they observed the barge listing prior to her being taken in tow by the Carrie Mack, but that they made no effort to ascertain the cause of the list. It was the responsibility of these employees to maintain the company's equipment so that it would be in a seaworthy condition. Records of the barge revealed that it had not been drydocked since February of 1958, and that at that time no work was done on the bottom plates of the vessel although they were found to need repairing. The employees knew the barge was taking on water from some source because they had pumped her out only a few days prior to the accident. Even though there was general testimony that most shell barges leak and have some degree of list; the Barge 204 should have been more thoroughly inspected before she was load-

---

5. See also The Edgar H. Vance, 9 Cir., 1922, 284 F. 56.

ed with a peak load of oyster shells. Also she should have been more thoroughly inspected subsequent to her loading. Bay Towing had the means of knowledge, through its officers and employees, to be apprized of the wasted condition of the bottom plates of the barge. This knowledge bars Bay Towing's efforts to bring itself within the purview of the liability limitation statute.

### III.

■ The Court has found Captain Miller, master of the Carrie Mack, negligent in the operation of the tug. While this negligence was not the only cause of the accident, it was so connected with the unseaworthiness of the barge that it was an equal fault in contributing to the death of Captain Miller. In ruling on the pleadings in this case, I have held that Captain Miller's contributory negligence, if any, would not be a bar to the recovery by his administratrix, but would be in mitigation as to amount. His fault being equal with that of the unseaworthiness of the barge, the recovery by the administratrix should be diminished by fifty per cent.

### IV.

■ Turning to the right of McDonald to recover for damages to his tug and to the right of Bay Towing to recover damages under its claim from McDonald, the Court is cognizant of the doctrine of mutual fault as it is applied to admiralty collision cases.[6] That doctrine provides that in collision cases where two vessels are at equal fault, each must pay one-half the other's damages. I do not think that doctrine is applicable to the facts in the instant cases for two reasons: (1) Here the faults were equal and separate, but they were so interrelated that both were responsible for the resulting damages. This is not a situation where two separately operated vessels collided, but a case where an unsea-worthy barge capsized on a tug whose master was negligent in his duties. The negligence of the master did not cause the barge to capsize because her own unseaworthiness produced that result; but his negligence did place the tug and her crew in a perilous situation. (2) This very complicated and peculiar set of facts does not in my opinion present a situation which could be classified as a collision, not even within the purview of the term in admiralty proceedings. Consequently, both Bay Towing and McDonald are barred from recovering any damages from each other.

### V.

■ Captain Sam McDonald, as owner of the Carrie Mack, is entitled to limit his liability to the value of the tug. It is unquestioned that Captain Miller was acting within the course of his employment at the time of the accident. McDonald, under the doctrine of *respondeat superior*, is liable for damages sustained by members of the crew as a result of the master's negligence. However, this does not mean that McDonald is barred from limiting his liability under section 183 (a) of Title 46 U.S.C.A. In La Bourgogne, 1908, 210 U.S. 95, 28 S.Ct. 664, 52 L.Ed. 973, the Supreme Court said:

"Without seeking presently to define the exact scope of the words privity and knowledge, it is apparent from what has been said that it has been long since settled by this court that mere negligence, pure and simple, in and of itself does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the statute." 210 U.S. at page 122, 28 S.Ct. at page 673.

And in Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, the Court said:

"In the case of individual owners it has been commonly held or de-

---

6. The North Star, 1882, 106 U.S. 17, 1 S. Ct. 41, 27 L.Ed. 91; The Chattahoochee, 1899, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801; Koch-Ellis Marine Contractors, Inc. v. Chemical Barge Lines, Inc., 5 Cir., 1955, 224 F.2d 115; Benedict on Admiralty, Vol. 3, sec. 417(a), p. 186.

clared that privity as used in the statute means some personal participation of the owner in the fault or negligence which caused or contributed to the loss or injury. [Citing cases.] That construction stems from the well settled policy to administer the statute not 'with a tight and grudging hand' \* \* \* but 'broadly and liberally' so as 'to achieve its purpose to encourage investments in shipbuilding and to afford an opportunity for the determination of claims against the vessel and its owner.'" 317 U.S. at page 411, 63 S.Ct. at page 293.

Having found that the Carrie Mack was seaworthy and that McDonald was without privity or knowledge of the master's negligence, it follows that he is entitled to limit his liability to the value of the tug as it lay on the bottom of the Mobile River. This value has been found to be $17,231.

## VI.

■ Neither Padgett nor Davis was guilty of any negligence which contributed to their respective injuries; therefore, Padgett's widow and Davis are entitled to recover damages from Sam McDonald and Bay Towing and Dredging Company.

### Damages

■ *Davis Claim.* Davis's damages are compensatory. His injuries consisted of a broken finger and a bruised knee and shock. It is true that he underwent a very harrowing experience; however, he did not lose any time from his work and he was never hospitalized. For the injuries sustained by him, I award Davis $3,000 damages. I assess $1,500 of this amount against Bay Towing and $1,500 against McDonald.

■ *Padgett Claim.* Padgett's administratrix contends that she is entitled to recover compensatory damages from McDonald under the Jones Act and also is entitled to recover punitive damages from Bay Towing under the Alabama Wrongful Death Act. There is merit in this contention. The Supreme Court of Alabama has repeatedly held that the damages recoverable under the wrongful death statute are punitive as distinguished from actual or compensatory.[7] Damages recoverable under the Jones Act, Title 46 U.S.C.A. § 688, are limited to pecuniary loss.[8] In view of these premises, I am of the opinion that Padgett's widow should be permitted to recover from both Bay Towing and McDonald.

■ At the time of his death, Padgett was forty-seven years old. Under the mortality tables of Alabama he possessed a life expectancy of 23.08 years. His average annual income at the time of his death was in excess of $3,600. His administratrix claims that the pecuniary loss to her was $250 a month for a period of 277 months. I am of the opinion that a more realistic figure would be $200 a month for a period of 180 months.[9] Application of the 3% discount rate under the Alabama Annuity Table indicates that the cash value of an annuity of $200 per month for 180 months is the sum of $28,961.08, and this is the amount that I find Mrs. Padgett is entitled to recover as compensatory damages. However, inasmuch as the Court has found that McDonald is entitled to limit liability to the value of the Carrie Mack as she lay on the bottom of the river, Mrs. Padgett is entitled to recover from McDonald $17,231 less the amount to be awarded Davis. Thus, Mrs. Padgett is entitled to recover the amount of $15,731 from McDonald.

7. Gulf, Mobile & Ohio R. Co. v. Williams, 251 Ala. 516, 38 So.2d 334; Day v. Downey, 256 Ala. 587, 56 So.2d 656; Hampton v. Roberson, 231 Ala. 55, 163 So. 644.

8. Petition of Southern Steamship Co. D.C.Del.1955, 135 F.Supp. 358; Gerardo v. United States, D.C.Cal.1951, 101 F. Supp. 383; Benedict on Admiralty, Vol. 1, sec. 144, Page 387; Sabine Towing Co. v. Brennan, 5 Cir., 1936, 85 F.2d 478.

9. The Smith Work-Life Expectancy Table.

I further award Mrs. Padgett, as punitive damages against Bay Towing for the wrongful death of John William Padgett, the amount of $18,731.

I further award Thelma Kennedy Miller, administratrix of the estate of Jesse E. Miller, deceased, as punitive damages against Bay Towing for the wrongful death of Jesse E. Miller, deceased, one half of $18,731, or $9,365.50.

I allow no interest in either the Davis, the Padgett, or the Miller claims prior to March 31, 1961, the date of the original decree. However, interest at the rate of 6% per annum shall run on the award in each of said claims from March 31, 1961, until paid.

Costs will be taxed against Bay Towing and McDonald, and divided equally between them.