**1354**

NAVIERA TABAGO S. A. and Compania
Naviera Malaguana S. A.,
Plaintiffs,

v.

SPRIGG CARROLL et al., Defendants.

No. 74–1213–Civ–CF.

United States District Court,
S. D. Florida.

May 29, 1975.

Fowler, White, Burnett, Hurley, Banick & Knight, Miami, Fla., for plaintiffs.

Arthur Roth, Miami, Fla., for defendants.

## MEMORANDUM OPINION

FULTON, Chief Judge.

### I. BACKGROUND

On September 20, 1974, in the federal district court for the Southern District of Florida, Naviera Tabago S.A. and Compania Naviera Malaguana S.A., charterer and owner of the vessel S/S PAPILLON, brought an action in rem and in personam for sale of the defendant vessel SPRIGG CARROLL, and judgment against the defendants for damages. According to the complaint, there was an agreement between plaintiffs and defendants that the SPRIGG CARROLL would tow the plaintiffs' vessel, the PAPILLON from Jacmel, Haiti, to Las Minas Bay, Panama, beginning on August 6, 1974. Plaintiffs alleged that the SPRIGG CARROLL through negligent operation allowed the towing hauser to become slack, and proceeded at excessive speed. As a result of such alleged negligence, the towing hauser broke leaving the PAPILLON adrift without power. Then the SPRIGG CARROLL allegedly abandoned the tow without informing the PAPILLON it was departing. Subsequently the PAPILLON went aground on the coast of Haiti and became a total loss. Plaintiffs claimed damages of $350,000.00, the fair market value of the PAPILLON, plus $60,000.00, the amount that would have been earned from a charter plaintiffs had booked on the PAPILLON commencing September 1, 1974, for a total claim of $410,000.00.

Defendants denied all of the substantive allegations of the Complaint, including the allegation that the SPRIGG CARROLL was a tug boat. Defendants alleged that the towline provided by the PAPILLON was inadequate, that the crew of the PAPILLON was inadequate, and the vessel was unseaworthy for the purpose intended. Defendants further alleged that while drifting, the PAPILLON either refused or could not put an anchor overboard; and that the captain of the PAPILLON made no attempt or an inadequate attempt to salvage the vessel or mitigate damages. Thus the PAPILLON was lost solely because of the plaintiffs' own negligence and the vessel's unseaworthiness. Defendants counter-claim for damages of $12,600.00, the contract price of $9,600.00 plus $3,000.00 bonus for delivery on or before August 15, 1974 that the parties had agreed upon. Plaintiffs denied all the allegations of the counter-claim. On January 16, 1975, a trial was held on the issue of liability only.

### II. FACTUAL HISTORY

Based upon the credible evidence advanced, the following is a summary of the events which led to the loss of the PAPILLON. On August 1, 1974, the PAPILLON, represented by her captain Alan Knox, entered into a towage con-

tract with Jean Arthur Rouzier and Roger Rouzier, the owners of the vessel SPRIGG CARROLL. The contract provided that the SPRIGG CARROLL would tow the PAPILLON from Jacmel, Haiti to Las Minas Bay, Panama, for a contract price of $9,600.00 plus a bonus of $3,000.00 if the PAPILLON arrived in Las Minas Bay by August 15, 1974. The contract provided that the PAPILLON would furnish all materials necessary for the tow.

The PAPILLON is a steam propelled vessel, 300 feet long, with a capacity of over 2600 gross tons, whose gunwale at the bow is about 25 feet above the water. The tubes in her boiler had ruptured. She was incapable of raising steam, which meant she could not energize any of her moving parts. Her only operative piece of machinery was one small generator. The SPRIGG CARROLL is a 110 foot vessel, with a capacity of about 200 gross tons, with one 950 horsepower engine. Her normal use is as a small cargo vessel, not as a tug. Her gunwale is 8 feet above the water at the bow. Because the SPRIGG CARROLL did not have sufficient fuel capacity for the 650 mile trip from Jacmel to Panama, two auxiliary fuel tanks of about 1200 gallons each were installed inside the cargo hold, midship, one on the starboard and the other on the port side.

The SPRIGG CARROLL left her home port of Port-au-Prince on August 1st, and arrived in Jacmel on August 5th, with a view toward commencing the trip on the morning of August 6th. The PAPILLON had dropped both of its main anchors. Since Captain Knox did not have a crew with which to manually raise the anchors, and since Jean Rouzier refused to use power equipment aboard the SPRIGG CARROLL for that purpose, he decided to cut them. When Captain Rouzier questioned his decision to cut the anchors, Captain Knox said that he had an emergency anchor he could use if needed, even though it was not rigged, and even though he had no power with which to drop or draw it

in. The contract required the PAPILLON to furnish the towing line. However, Jean Rouzier of the SPRIGG CARROLL obtained a brand new four inch polypropolene line about 450 feet long which the parties decided to use. By noon on August 6th, the towing line was in place, the anchors cut, and the tow got underway.

When the voyage began, there was no wind and the sea was calm. The SPRIGG CARROLL had a crew of eleven including Jean Rouzier who sailed as captain, and Jean Fleurime who served as first officer. Neither Rouzier or Fleurime possessed any licenses. In addition to Captain Knox, there were four other people aboard the PAPILLON: a Haitian who came aboard to repair a generator, a seaman with six years experience, and a husband and wife who were aboard only because they wanted to go to Panama.

Shortly after the tow began, weather and sea conditions began to change. The captains communicated over a walkie-talkie provided by Captain Rouzier. At some point during the afternoon the auxiliary fuel tanks aboard the SPRIGG CARROLL became loose and started rolling violently. Captain Rouzier testified that he told Captain Knox that because the sea was getting very rough, they would have to turn back and look for a safe place such as the port of Ile a Vaches. He testified that while attempting to make a turn, the tow line became slack, and when the slack was taken up, the line broke, at about 4:30 p. m. Contrarily, Captain Knox testified that about 4:00 p. m. Captain ROUZIER communicated that due to the heavy seas, the tanks had become dislodged. The tow was then discontinued while the tanks were resecured. When the tow resumed, the line snapped at the moment that the slack was taken up. As more fully discussed in Section III, the Court finds and concludes that Captain Knox's testimony was the more believable and it is his version that the Court accepts.

After the line broke, the crews attempted unsuccessfully to pass an auxillary line. During these maneuvers, the vessels collided. The collision occurred at about 6:30 p. m. Captain Rouzier testified that the tanks became dislodged upon the collision. However, the Court concludes that the more credible testimony was that the tanks became dislodged earlier, before the line snapped.

After the collision, the parties made no further attempt to receive a substitute line. The testimony as to what occurred after the collision was contradictory. However, the Court finds that the testimony of Captain Knox is the more credible and concludes that after the collision, the SPRIGG CARROLL never attempted to communicate with the PAPILLON again. First the SPRIGG CARROLL went about a mile away and waited awhile, and then it became totally dark and Captain Knox never again saw or heard from the SPRIGG CARROLL.

At 10:00 p. m. that evening, the yacht APHRODITE passed by close enough to the PAPILLON to allow the captains to talk mouth to mouth. The APHRODITE offered help to the PAPILLON, which had begun drifting about 8:30 p. m. Captain Knox said he did not accept help from the APHRODITE because he was awaiting the return of the SPRIGG CARROLL. During the 16 hours the vessel was stranded and drifting, he made no attempt to lower the emergency anchor.

At 4:00 a. m. on August 7th, Captain Knox could see the south coast line of Haiti; he ordered the four other people aboard the PAPILLON to prepare life boats. At about 11:00 a. m. Captain Knox and the four passengers abandoned ship, and at 3:00 p. m. that day, the PAPILLON was driven ashore onto Troumarou, the south coast of Haiti. On the next morning, August 8th, the SPRIGG CARROLL set out to look for the PAPILLON, and was unable to find her because she had gone aground the previous afternoon.

Having heard the evidence presented at the trial, and having considered the briefs filed by the parties, the Court finds and concludes that there was negligence by both sides. The Court will consider the negligence of the parties separately.

### III. NEGLIGENCE OF THE DEFENDANTS

Turning first to the negligence of the defendants Rouzier brothers and the vessel SPRIGG CARROLL, the Court concludes that the crew was inexperienced, and the vessel SPRIGG CARROLL, really a cargo vessel, was inadequate for the task. When a tower undertakes a contract of towage the law implies that he possesses sufficient skill to perform the task safely. Howlett Inc. v. Tug Dalzellido, 324 F.Supp. 912, 917 (S.D.N.Y.1971). The tower has an obligation to exercise reasonable care and skill. Hart v. Blakemore, 410 F.2d 218, 221 (5th Cir. 1969). The tug is not liable as an insurer or a common carrier, but must exercise the same degree of skill as prudent navigators employ in the performance of similar services. A. E. Staley Manufacturing Co. v. Porto Rico Lighterage Co., 323 F.Supp. 27, 36 (E.D.La.1970). Although Captain Jean Rouzier was inexperienced he knew that heavy seas and rough winds were common during the month of August. He knew that the PAPILLON was completely dependent on the SPRIGG CARROLL. Since he was aware that the risk of heavy seas made the undertaking dangerous, his mere warning was insufficient; he had the obligation to refuse to go underway if he was uncertain of his ability to make the trip safely. Parenthetically, however, the Court notes that Captain Knox of the PAPILLON was an experienced seaman, and undoubtedly he was well aware of the weather conditions that were to be expected at that time of

year. His willingness to go ahead indicates some assumption of the risks involved.

There is a sharp dispute between the Rouzier brothers and their mate Fleurime on the one side, and Knox on the other as to when the tanks came loose. The Rouziers and Fleurime contend that the tanks were dislodged from their chocks when the vessels collided. However, Captain Knox testified that about 4:00 in the afternoon of August 6th, Captain Rouzier contacted him over the walkie-talkie and advised that the tanks had come loose and that he was having trouble with them. Knox testified that the tow was discontinued for some time so that the crew of the SPRIGG CARROLL could secure the tanks, and that after this had been done, the tow line was snapped when the SPRIGG CARROLL was moving off to take out the slack in the line. Knox testified that after the collision, the SPRIGG CARROLL moved about a mile away where she laid motionless for an hour or so. She then departed without again communicating with him.

Mr. Clifton H. Handy, marine engineer and surveyor, testified as an expert witness for plaintiffs. No counter expert witness testified for defendants. Mr. Handy pointed out that the evidence showed that the bow of the SPRIGG CARROLL struck the PAPILLON midship, and that this sort of jolt could not have rotated the tanks out of their chocks sidewise, as claimed by Rouzier. Moreover, a collision severe enough to make the tanks slide would have to have caused some damage to the PAPILLON, of which there was none from the collision of the two vessels. The Court finds and concludes that the testimony of Captain Knox is credible and believable as to when the tanks gave trouble. Thus the Court concludes that the delay preceding the parting of the line was caused by the tanks having come loose, and that the tanks became dislodged because they had been inadequately fastened, not from a collision of the vessels.

■ The tower's obligation to use due care includes the duty to keep her tow under observation, and to maintain the proper speed in order to keep the tow under control. Chitty v. M/V Valley Voyager, 284 F.Supp. 297, 303 (E.D.La.1968). There is no satisfactory evidence as to the cause of the break in the tow line. Neither party suggested that the polypropolene line was not sufficient for the task. The Court cannot rule out the possibility that the slackened nylon line was cut by the propeller of the SPRIGG CARROLL. However, neither party assumed responsibility for producing for the Court's inspection that portion of the line which remained attached to the SPRIGG CARROLL. Thus the only conclusion that can be made on the basis of the evidence available is that the SPRIGG CARROLL proceeded to take out the slack at too rapid a speed which caused the line to snap.

■■ According to the testimony of Captain Rouzier, the SPRIGG CARROLL left the PAPILLON because the crew was unable to secure the tanks. He testified that his intention was to obtain repairs for his vessel, and then return to the PAPILLON. He testified that he left the PAPILLON and went to Ile a Vaches, a port 60 miles away rather than Jacmel, a port 20 miles away, because Ile a Vaches was a protected harbor and Jacmel was not. Then, the SPRIGG CARROLL waited over a day to return. No evidence was presented which tended to show that the SPRIGG CARROLL could not have been safely moored and repaired at Jacmel. A tug's responsibility for its tow does not end merely because trouble is incurred during the voyage. To the contrary, "[a] tug's responsibility for its tow is not terminated until the tow is safely anchored at the completion of the voyage." Daniels Towing Service, Inc. v. Nat Harrison Assoc. Inc., 303

F.Supp. 1065, 1066–67 (S.D.Fla.1969) (Atkins, J.). When conditions develop such that the tug cannot deliver the tow at her destination, "it is her duty to tie the tow adequately and protect it." United States v. Powell Bros. Barge No. 128, 249 F.Supp. 553, 556–57 (S.D.Fla. 1965) (Mehrtens, J.).

In Allied Chemical & Dye Corporation v. Tug Christine Moran, 303 F.2d 197 (2d Cir. 1962) (hereinafter referred to as "Christine Moran"), the facts were nearly identical to the situation presented in this case. While towing a barge, the Barrett, from North Carolina to New York City, a storm developed. Instead of continuing, the tug ordered the barge to drop one of its two anchors. The tug then left the barge at anchor and proceeded to shore for the night. The tug Christine Moran did not return to the anchorage until noon the next day, by which time the barge had drifted some three miles and gone aground. In *Christine Moran,* the barge, unlike the PAPILLON, was safely anchored when the tow departed. Nevertheless the appellate court affirmed the trial court's conclusion that:

> The Christine had a continuing duty to care for and protect or render assistance to the Barrett. This duty was not terminated or suspended when the Barrett was anchored. In failing to return to aid the barge when it knew of the dangerous conditions, the Christine breached that duty.

303 F.2d at 200.

■ Captain Rouzier knew that the PAPILLON had no power, and that its spare anchor was not rigged. He knew there were five people aboard. Nevertheless, fully knowing the PAPILLON's precarious state, he decided to go to the more distant harbor, and to wait over a day to return. The Court concludes that Captain Rouzier exercised poor judgment. His abandonment of the tow, leaving her helplessly adrift, constituted grave negligence.

## IV. NEGLIGENCE OF THE PLAINTIFFS

■ The Court finds and concludes that the negligence of the plaintiffs was as great as that of the defendants. Captain Knox of the PAPILLON knew of the inexperience of Captain Rouzier, and of the danger of heavy seas at that time of year. Captain Knox selected the SPRIGG CARROLL, even though he knew she was not built to tow, and lacked adequate fuel capacity for the trip. Thus the Court finds that he impliedly assumed the risks of heavy seas, and the possible inadequacy of the SPRIGG CARROLL.

The evidence indicated that although the PAPILLON was without power it had aboard one operative piece of machinery: a small generator run by gasoline. Captain Knox, however, failed to carry enough gasoline to run the radio continuously, or provide adequate lighting. The towage contract provided that the PAPILLON was responsible for all equipment needed for the tow. However, the PAPILLON carried no emergency line which could be easily affixed between the two vessels. Moreover, the original line provided by the PAPILLON was considered less desirable by both captains than the SPRIGG CARROLL's polypropolene line.

Captain Knox testified that about 10:00 p.m., while drifting, the vessel APHRODITE passed by close enough for the captains to talk mouth to mouth. He testified that he refused the APHRODITE's offer of assistance because he was waiting for the SPRIGG CARROLL to return. He had no assurance that the SPRIGG CARROLL would come back, or would be able to find the PAPILLON; he knew he was in great peril without power and without an anchor ready to be dropped. The Court finds and concludes that this rejection of aid was negligence on the part of Captain Knox.

The most serious negligence on the part of Captain Knox and the PAPILLON was the failure to set up and drop

the emergency anchor while drifting for sixteen hours between the time the SPRIGG CARROLL left the tow, and the time the PAPILLON went aground. The Court finds that Knox's decision to cut the anchors in Jacmel constituted negligence in light of the fact that it left the PAPILLON with only one emergency anchor not ready for use. Testimony was presented to the effect that when questioned about his decision to cut the anchors, Captain Knox replied that he had a spare anchor which he could use if necessary. The facts however were that the spare anchor weighed nearly 2000 pounds, the PAPILLON had no power, and a crew of only five people, only two of whom were seamen. Captain Knox made no attempt to get the anchor rigged before departing Jacmel, and he made no attempt during the sixteen hours the vessel was drifting. When questioned by the Court as to why he did not put the anchor overboard during that sixteen hour interval, Captain Knox replied that he was expecting the return of the SPRIGG CARROLL. He stated that when the coast line came into view, he felt it was too late to put the anchor over, and that the water probably was too deep. When pressed, he said that in retrospect he thought he was in error not to have put the anchor over earlier.

The failure of the tow to have an anchor has been held to be such intervening negligence as to be the proximate cause of a collision between the tow and a third anchored vessel. The Panther, 5 F.2d 64 (2d Cir. 1925). In *Christine Moran*, failure of the tow to drop its second anchor during a drifting period of four hours was held to be negligence. 303 F.2d at 199–200. Similarly, the Court concludes that the PAPILLON's inability and failure to drop an anchor while drifting constituted serious negligence.

## V. JOINT LIABILITY

■ The PAPILLON was without means of moving her inner parts. Her steering mechanism was locked; she had inadequate means of communication and she had no anchor ready for use. She lacked an adequate supply of gasoline, and had no ready means of passing an emergency line. The SPRIGG CARROLL had inadequate fuel capacity for the trip, and improperly installed two auxillary fuel tanks such that the roll of the seas caused them to become unfastened. Thus the Court concludes that both vessels were unseaworthy for the purposes intended.

■ Although there was a collision at sea when the vessels tried to pass a substitute line, the collision was not the proximate cause of the loss of the PAPILLON. The Court concludes that the real causes of the loss were the shifting of the tanks aboard the SPRIGG CARROLL and the failure of the PAPILLON to drop an anchor. Thus the Court finds that both parties were negligent. The Court finds it impossible to separate the fault of one party from that of the other. Each substantially and proximately contributed to the loss of the PAPILLON. The joint fault resulting from the unseaworthiness of both vessels and the joint negligence of both crews was so substantial and equal as to causation, that the Court finds it impossible to reduce fault to a percentage basis other than to find and conclude that the parties are equally at fault.

## VI. DAMAGES

The ordinary doctrine in a collision case is that damages are divided when both parties are at fault. Gilmore and Black, The Law of Admiralty, 402 (1957). *Accord*, Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496, 497–98 (2d Cir. 1961); Houma Well Service, Inc. v. Tug Capt. O'Brien, 312 F. Supp. 257, 263 (E.D.La.1970); McDonald v. The 204, 194 F.Supp. 383, 390 (S. D.Ala. 1961). However, as previously noted, the Court concludes that although a collision at sea did occur, it was not the proximate cause of the loss of the PAPILLON. Nevertheless, even though

the Court need not follow the divided damages rule, for the reasons set forth below, it believes that this doctrine is appropriate and just.

In McDonald v. The 204, *supra*, the capsizing of the barge onto its tug resulted in substantial damages to both the barge and the tug. In that case, the court found that the unseaworthiness of the tow and the negligence of the captain of the tug jointly caused the accident. The court found that the faults were equal and separate, but so interrelated that both were responsible for the resulting damages. 194 F.Supp. at 390. The court concluded that the complicated set of facts could not be classified as a collision and thus it declined to follow the rule of divided damages. Instead it held that because of the joint fault, each vessel was barred from recovering any damages from the other. *Id.* In McDonald v. The 204, both vessels suffered substantial damage. In the case before the Court, the SPRIGG CARROLL suffered only slight damage, whereas the PAPILLION was a total loss. Therefore the Court concludes that the situation before it is not totally analogous to that in McDonald v. The 204, and that it would be inequitable to follow the result adopted in that case.

Conversely, the Court believes that the proper approach for determining damages here was adopted in *Christine Moran.* In *Christine Moran,* the facts were nearly identical to the facts before the Court. Damages were suffered solely by the barge; they were incurred due to the vessel's going aground, and not from a collision. The court held that because of the fault of both the tug and the barge, the barge's damages should be limited to one-half of the amount determined. 303 F.2d at 200–201. Similarly, the Court concludes that both parties must assume responsibility for the loss of the PAPILLON. Because of the joint fault by both plaintiffs and defendants, it is

Ordered and adjudged that each party shall bear half of the total damages. Defendants are not entitled to their contract price, since the condition precedent, tow of the PAPILLON to Panama, was not accomplished.

A further hearing shall be held to determine the amount of damages incurred at a date to be set by further Order of this Court.